1805.

Lessee of Frazer and others, Assignees of Greeves a bankrupt, *against* Hallowell.

THIS was an ejectment for a house and lot in the city of *Philadelphia;* and the following case was therein stated for the opinion of the court, to be considered as a special verdict.

" On the 17th day of *March* 1797, *John Shields* executed a " mortgage of the premises in question to the defendant to " secure a debt of 1207 dolls. 50 cts. On the 20th day of *Au-* " *gust* 1800 the assignees of *John Shields*, by indorsement on " the mortgage, released the equity of redemption to the defen- " dant. This mortgage was taken in the defendant's name, to " secure a debt due by *John Shields* to *Thomas Greeves*, and for " his use, and the release was executed to the defendant for the " said *Greeves's* use." [A supplementary case stated among other things that the debt was by a note purchased in the market for *Greeves*, which *Hallowell* undertook to secure; that the name of *Greeves* did not appear in the transaction, nor was it known to *Shields;* and that the mortgaged premises were put up at public sale at the request of *Shields*, and bought in by *Hallowell*, after which *Shields's* general assignees released.]

" After the release was executed, which with the mortgage " always remained in the defendant's possession, the defendant " lent *Thomas Greeves* his notes, which were discounted at the " bank of *Pennsylvania* for his the said *Thomas Greeves's* use, " and which were frequently renewed till the 7th day of *August* " 1802, when the defendant paid for the said *Thomas Greeves* " one of those notes amounting to 650 dolls. and on the 2d day " of *September* following paid another for him of 500 dolls.

" After *Thomas Greeves* stopped payment and before the " issuing of a commission of bankruptcy against him, the de- " fendant told *Greeves* that he would keep the estate in question " till he was reimbursed the 1150 dolls., which he had thus " paid for him; but it is admitted that the mortgage and release " were not originally executed to the defendant for the purpose " of securing any debt due by *Greeves* to him, nor was any " agreement subsequently made that the defendant should hold " the estate as a security for any money owing by *Greeves* to

*Friday,*
September 13th.

A. as agent for B., and to secure a debt due to him, takes a mortgage of real estate in his own name from the debtor, and then obtains a re-lease of the equity of re-demption. A. retains the title deeds and B. re-ceives the rents and profits. Af-terwards A. lends his notes to B., and finally takes them up, shortly after which B. is declar-ed a bank-rupt. B.'s as-signees can-not recover the premises from A. until they reim-burse him the amount so paid for B.

" him. It is also admitted that *Greeves* received the rents and " profits of the premises up to the time of his bankruptcy.

" On the —— day of *December* 1802 *Greeves* was declared a " bankrupt by the commissioners under a commission lawfully " issued against him dated the 19th *November* 1802, and the " commissioners on the 21st *December* 1802 made a general " assignment in the usual form to the lessors of the plaintiff, of " all the estate and effects of the said *Thomas Greeves* for the " use of his creditors.

" If upon the above facts the court shall be of opinion that " the lessors of the plaintiff are entitled to recover and hold the " premises in question to be appropriated to the use of the " creditors of *Thomas Greeves* generally, then judgment to be " entered for the plaintiff. But if the court shall be of opinion " that the premises in question ought to remain as a security in " the hands of the defendant for the monies due to him by " *Thomas Greeves*, and that the lessors of the plaintiff are not " entitled to recover and hold the same until the said monies " are reimbursed to the defendant, then judgment to be entered " for defendant."

It was argued in *December* term 1804, by *Dallas* and *W. Tilghman* for the plaintiff, and by *Condy* and *E. Tilghman* for the defendant.

For the plaintiff. A person whose name has been used as the grantee in a conveyance, but who has paid no purchase money, expended nothing upon the trust, received none of the rents and profits, a mere name on the papers, lends money upon a distinct transaction to the real owner who becomes bankrupt, and then claims a lien on the property for his debt. This is the defendant's claim, and it is against equity as well as law. We represent the general creditors who have more equity than the defendant, and we are upheld by the bankrupt law. In *Pennsylvania* such a claim is out of the question, for here the owner of the trust is the master of the legal estate. He may bring ejectment for it in his own name. *Kennedy* v. *Fury*. (a) His wife is dowable of it. A judgment against him is a lien upon it, by which it may be taken in execution; and no conveyance of the

1805.

FRAZER
*v.*
HALLO-
WELL.

(a) 1 *Dall*. 72

1805.

FRAZER
v.
HALLO-
WELL.

trust after judgment will defeat the creditor. If A. uses B.'s name at the land office and pays the money, he has the title and may sell the land; it is every day's practice; and it never was heard of that B. could hold the land until a debt due to him by A. was paid. In all these particulars we deviate from the law of *England;* for there the complete legal estate and the control over it are in the trustee; so much so that if after judgment against *cestui que trust* and before execution sued, the trustee conveys the lands, they cannot be taken in execution. *Hunt* v. *Coles et al.* (a) If therefore any *English* cases favour the defendant, it is upon principles which do not apply here. One ground upon which they there make the legal estate in a mortgagee a security for claims that do not arise out of the mortgage, is because when the mortgagor or his heir or assignee comes to foreclose they apply the principle that he who asks equity must do it. But here we ask no equity, we are entitled to this estate at law, our very process is ejectment. Another ground is that by compelling the plaintiff in the bill to pay other debts to the defendant, they avoid a circuity of action; but where an action will not do the same thing the ground fails. Thus upon a bill to foreclose, a mortgagee may tack his bond to the mortgage as against the heir, because when the land is redeemed it becomes assets in the hands of the heir; but it cannot be done as against third persons. *Lowthian* v. *Hasel* (b). The court never allows it against creditors. 2 *Vez.* 162. *Anon.* Another ground is an agreement or presumed agreement that the legal estate shall stand as a further security. But the present case states no agreement; on the contrary it states facts which negative an agreement.

The case being clear of these principles how does it stand upon authority in the particular case of trusts? So far as the silence of the books is an argument, it is with us. For the only decision apparently against us is in a note in 2 *Cha. Ca.* 87. very imperfectly reported; and there the trustee bought the estate with his own money; and was also the general agent of *cestui que trust.* Equity therefore would not give Lord *Dacres* the land without paying *Crompe* all he owed him for his agency, of which this land was but an item. The language which is constantly used, that trustees should be saved harm-

(a) 1 *Com. Rep.* 226.                    (b) *Brown's Ca. Cha.*162.

less as to all damages *relating to the trust*, implies that the indemnity shall go no further. *Balsh* v. *Hyham.* (a).

But whatever might be the case between the defendant and *Greeves*, the rights of third persons intervened before the notes were paid, and before any intention of resorting to this security was declared. *Greeves* had then stopped payment, and had he given a deed of the house to *Hallowell* it would have been too late; he must have done it in contemplation of an act of bankruptcy.

For the defendant. The case is to be considered, *first*, as between the defendant and *Greeves;* and *secondly*, as between the defendant and the assignees of *Greeves*.

1. The statement shews that *Hallowell's* object was to secure a debt due by *Shields* to *Greeves*, and that all the proceedings were mere machinery. He stands then in the position of a factor, who collects debts, advances money, and may unquestionably retain. If instead of money he takes goods, he has a lien on them. If he takes a bond or mortgage it is the same thing; and it is still the same if he takes land. It becomes from the purpose with which it is assigned an article of merchandise, subject to the same disposition, answering the same views, and in equity is governed by the same principles. Land devised to pay legacies is money; money devised to buy land, is land; it is the purpose which is the material thing, even in *England* where real estate has a peculiar sanctity; *a fortiori* in *Pennsylvania* where it has become an axiom that lands are chattels for the payment of debts.

Chancery will never decree a conveyance from the agent to the principal, until the agent's debt is paid. *Bradburne* v. *Amand* (b) is decisive. Lord *Dacres* employed *Crompe* to purchase land for him, and to take up money for it, which he did, and took the purchase in his own name. Lord *Dacres* by bill prayed that *Crompe* might convey the lands upon payment of the money; but as *Crompe* had upon other occasions mortgaged and engaged for Lord *Dacres*, the Lord Chancellor decreed that the latter should pay all or none. The answers to this case are not satisfactory. Its being *Crompe's* own money was of no consequence, for Lord *Dacres* offered to pay that; and as to his being

(a) 2 *P. Wms.* 455.  (b) 2 *Cha. Ca* 87.

1805.

FRAZER
*v.*
HALLO-
WELL.

the general agent, the law no where says how much agency is necessary to constitute this equity.

It moreover consisted with *Hallowell's* authority to sell this land, and if he had sold it he might have set off the debt against the proceeds. It is therefore against conscience when this was the true design of the parties, to treat the security as real estate to prevent a discount, which is natural justice in all cases. 1 *Eq. Abr.* 8. *pl.* 6.

But the defendant must succeed upon another ground. To a bill to redeem a mortgage, the defendant answered that he had lent the mortgagee two sums on two mortgages, one of which was deficient in value and was not asked to be redeemed; and the decree was that both should be redeemed or neither. *Pope* v. *Onslow* (*a*), *Mergrave* v. *Lehooke* (*b*). He that asks equity must do equity. But it is said *Greeves* was to all intents the owner, that the trustee was a mere name, and that he does not ask equity. This is not so. The law of *Pennsylvania* on the subject of trusts is the same with the law of *England* in every case that does not turn upon a question of remedy. We have no Court of Chancery, and the *cestui que trust* must therefore have an ejectment, or he can have nothing; but he maintains it on his equitable title, and not because he is master of the legal estate. We deny that a wife is dowable of a trust; it has never been so determined; the legal estate is never overlooked unless where if set up it would defeat the beneficial interest; and the case then is as though *Greeves* asked a conveyance of the legal estate, which he could not have without doing equity to the trustee. This very point was decided in *Cecil's lessee* v. *Peters*, at *York* Nisi Prius in 1788, where all the sums due to the defendant the trustee, were ordered to be paid before the plaintiff should have a conveyance or recover. To the same effect is *Harwood* v. *Wraynam.* (*c*)

There is yet a third ground. It is a presumption of law that we lent our money upon the land, knowing that we had hold of the land by the mortgage and release. It is upon this principle that if a first mortgagee lends a further sum to the mortgagor upon a statute or judgment, he shall retain against a mesne mortgagee until both mortgage and statute are paid. *Brace* v. *Dutchess of Marlborough.* (*d*)

(*a*) 2 *Vern.* 286.          (*c*) 1 *Roll. Rep.* 56.
(*b*) 2 *Vern.* 207.          (*d*) 2 *P. Wms.* 494.

2. The assignees take the bankrupt's estate bound by all the equity to which it was liable in the bankrupt's hands. *Taylor* v. *Wheeler* (a), *Brown* v. *Jones* (b), *Hinton* v. *Hinton* (c). They have even less equity than an individual assignee without notice. 1 *Fonbl.* 90. The only question then is whether *Greeves* committed or contemplated an act of bankruptcy when the defendant's equity arose; and as to this the case is silent, though it is manifest that the equity arose when the notes were given. If the payment of a note is made after an act of bankruptcy, it may nevertheless be set off against a demand by the assignees, provided the note was given before. *Smith* v. *Hodson.* (d)

SHIPPEN C. J. was not present at the argument.

YEATES J. I find myself confined to the facts stated as on a special verdict; and I do not feel myself at liberty to indulge any conjecture on the occasion. Our decision must be grounded on the statement itself; and from this I am only authorized to state that Mr. *Hallowell* was the agent of *Greeves* in accepting the mortgage, to secure the original debt, and the release of the equity of redemption. The latter instrument recites the nominal consideration of 7s. 6d., and that the mortgaged premises had been struck off at public auction for 910 dollars. It cannot be denied that a mortgage in *Pennsylvania* as well as in *England* is considered as a personal contract, and that the mortgagee has no interest in the lands beyond the security of his debt. *Prec. Cha.* 99. *Stra.* 135. 413. *Burr.* 978. It is true there is a difference in the mode of recovery in the two countries. Instead of foreclosing the equity of redemption by a bill in Chancery, our act of Assembly directs the remedy by *scire facias*, and an immediate sale of the mortgaged premises under a *levari facias*. When the mortgage money is paid, the mortgagee is obliged to enter satisfaction in the recorder's office of the proper county, under a defined penalty. Hence it is that a third mortgagee in this state buying in a first mortgage shall not have a preference against the second mortgagee until the sums secured by both instruments are paid. But in *England* it is otherwise under the operation of the principle in Chancery, that where there is a legal title and equity on one side, the Chancellor will not permit

1805.

FRAZER
v.
HALLO-
WELL.

(a) 2 *Vern.* 564.          (c) 2 *Vez.* 633.
(b) 1 *Atk.* 187.          (d) 4 *D. & E.* 211.

1805.

FRAZER
v.
HALLO-
WELL.

the prior equity of another person to prevail against such title. But we have the authority of Lord *Hardwicke* to declare that if this had happened in any other country it could never have made a question: for if the law and equity are administered by the same jurisdiction, the rule *qui prior est tempore potior est jure* must hold. 2 *Vez.* 574.

Much reasoning has been grounded on this, that the premises in controversy are to be deemed as under a mortgage from *Shields* to the defendant; and inasmuch as it was the object of the mortgage to secure a debt of 1207 dollars 50 cents, the transaction has been compared to those cases where lands have been devised to be converted into money; there equity hath regarded them as money, and *vice versa.* 2 *Atk.* 307. 3 *Atk.* 254. And so land agreed to be sold shall go as money, and money agreed to be laid out in land shall go as land. *Salk.* 154. If indeed from any circumstances disclosed in the case, we are enabled to pronounce that *Greeves* or his assignees might recur to Mr. *Hallowell* for the original debt due from *Shields*, and that it could still be considered as an existing personal demand, all difficulties would cease; because it is settled in *Smith et al. assignees* v. *Hodson*, 4 *T. R.* 216. that where the defendant lent his acceptance to the bankrupt on a bill which did not become due till after the act of bankruptcy, and was then outstanding in the hands of third persons, yet the defendant having paid the amount after the commission issued and before the action brought by the assignees, is legally entitled to a set-off. But here, by the conduct of both parties, and by *Greeves's* acquiescence in the acceptance of the mortgage and release, and his subsequent receipt of the rents and profits of the premises in question, up to the time of his bankruptcy, his demand of a personal nature is converted into an equitable interest in the land, and neither he nor his assignees could afterwards look to the defendant for the original debt.

It is obvious also that the equity of redemption being extinguished by the release of the assignees of *Shields* to the defendant and accepted by him for the use of *Greeves*, the defeasible nature of the estate ceased and was wholly absorbed; the strictly legal interest in the premises became vested in Mr. *Hallowell*, and the usufructuary interest in *Greeves*. In *Pennsylvania* where we have no court of Chancery, it must be admitted that in such trust deeds, the legal estate is almost *nominal* from

1805.

FRAZER
*v.*
HALLO-
WELL.

the necessity of the case. With respect to the power of the trustee to prejudice his *cestui que trust* by alienation, the single case in which his alienation can bind the *cestui que trust* is where being in possession of the estate he conveys it for a valuable consideration and without notice, in which case the purchaser will be entitled to hold the estate against the *cestui que trust.* 1 *P. Wms.* 128. 2 *Fonbl.* 170. Here a *cestui que trust* may support an ejectment in his own name, though it cannot be done in *England* unless in some special cases. 1 *Dall.* 72.

The point in question may be viewed in two lights: considering *Greeves* in full credit when the accommodation notes were taken up, or as a bankrupt. Mr. *Hallowell* can only be considered as a mere trustee whose name has been used. He falls within the general principle, that an estate purchased in the name of one with the money of another is a resulting trust, although there be no written declaration, and is excepted out of the statute of frauds. 1 *Atk.* 60. 1 *Vern.* 367.

If an ejectment had been brought by *Greeves*, when solvent, against the defendant, I should suppose there could be no difficulty in asserting that the latter could not defend himself in possession by the offer of proof that the former owed him money, which he had lent to him or expended for him in matters wholly *foreign* to the trust estate, and for which the former had neither given nor engaged to give any security either real or personal. Are we warranted from the facts stated in adopting the language of the master of the rolls in *Brace* v. *the Dutchess of Marlboro*, 2 *P. Wms.* 494. in the case of a first mortgagee lending a further sum to the mortgagor upon a statute or judgment, " that *it is to be presumed*" that defendant lent his notes as knowing he had hold of the lands by the mortgage and release in his possession, and in consequence ventured a sum which would be a lien thereon? It is settled that the title of a trustee shall not be set up in ejectment against the *cestui que trust*, from the nature of the two rights the latter is to have the possession. *Burr.* 1901. As a matter of abstract equity and morality it may justly be said that while *Greeves* was seeking for the premises as due to him of right, he ought on his part to pay Mr. *Hallowell* a fair and meritorious debt; but it could scarcely be urged that in such a suit a court of law who are bound to distinguish by known rules between real and personal estates, should adopt the principle that " he who seeks equity

" shall do equity," and direct a set-off of the debt, or a retainer of the possession until the same should be paid. They would necessarily order a recovery in the ejectment against the trustee, and leave him to his personal remedy against *Greeves* for his demand.

The case of the lessee of *Charles Cecil* v. *Henry Korbman, (Richard Peters)* tried at *York* Nisi Prius on the 12th and 13th *June* 1788, has been cited and much relied on by defendant. I was of counsel with the defendant in that case, and will fully state from my notes the pretensions of both parties. It was an ejectment for 150 acres of land in *Codorus* township. The defendant claimed under a conveyance to *William Peters* from *Ambrose Draper*, the eldest great grandson of *John Brothers*, who obtained deeds of lease and release from *William Penn* for 250 acres of land to be *located any where in Pennsylvania*, dated 2d *August* 1681. The plaintiff claimed under a subsequent deed from three others, the great grandchildren of the original grantee, and the son of one of them who was dead. *Peters* released to *Joseph Richardson*, who in pursuance thereof obtained a warrant in 1762 for the 250 acres, on which were surveyed the 150 acres in question, (inter alia) in 1763. One *Henry Conrad* had settled on the lands in controversy in or about 1748, built a small house and a mill called the Green Mill, including under one roof a grist mill, oil mill, and slitting mill, a large barn, cleared land, and made ten or twelve acres of meadow; and continued in possession for twenty six years. Mr. *Peters* contracted, and the warrant was laid on the land disputed, and a patent obtained thereon founded on the old right. *Conrad* might certainly have maintained his possession under his valuable improvement and actual settlement, because the old right could not legally have been laid thereon, after settlement and appropriation. But he and the vendees under him were *concluded* and estopped from setting up an adverse title by the material recital of particular facts on which they founded their pretensions. *Peters* therefore and his vendee held the legal title as to four sixth parts in trust for the other great grandchildren or their vendee; but the well known rule " that he who seeks equity shall do equity," clearly applied to that case. Those entitled to their proportions of the old right to unlocated lands, could have no just claim to the lands located under it, unless they paid their proportions of the sums advanced in lay-

ing it, and securing the different tracts held under it. Hence it was that after the evidence was fully heard a juror was withdrawn and a special compromise submitted to. It was finally referred to the Judges of the Supreme Court to state an account of all expenditures under the old right by *William Peters*, and to charge him with all profits and rents and sums of money received, with interest on the several sums, and upon *Cecil* paying two thirds of the balance in three months it was agreed that he should receive a conveyance of two thirds of the premises and immediate possession. A report was accordingly made on 12th *April* 1790, that *Cecil* should pay 1112*l.* 8*s.* 6*d.* which it was not the interest of the lessor of the plaintiff to comply with.

The circumstance of the money advanced by Mr. *Hallowell* not being for any matter or thing relative to the trust estate, forms a strong and marked distinction in my idea between the two cases. Nor can I find any authority on the best search I have been able to make, wherein trustees have been allowed out of the trust fund for services or matters done or monies paid, wholly unconnected with or foreign to the trust.

The case is made stronger when we consider the bankruptcy of *Greeves* and the other facts stated. Though the precise time of *Greeves'* committing an act of bankruptcy is not specified, the commission against him issued on the 19th *November* 1802. On the 7th *August* and 2d *September* preceding, Mr. *Hallowell* paid on his account the two accommodation notes amounting to 1150 dollars; but it was not till after *Greeves* stopped payment, though before issuing the commission, that the former told him that he would keep the estate in question until he was reimbursed the cash he had advanced, no agreement having been previously made that Mr. *Hallowell* should hold the property until he was repaid. Unless the defendant had a previous lien or some valid or binding agreement, operating either legally or equitably as such, the policy of the law interdicts a bankrupt from giving a preference to any of his creditors on the eve of a bankruptcy. The act of Congress of the 4th *April* 1801, in section 12th, exempts mortgages and pledges from the general operation of its provisions; it contemplates a system of perfect equality to all the creditors who have not used the precaution to secure themselves; and it therefore follows that even if *Greeves* after he had stopped payment, had

1805.

FRAZER
*v.*
HALLO-
WELL.

assented to the declarations of the defendant stated in the case; such assent could not legally take effect.

Upon the whole, let my feelings as an individual be what they may, I find myself constrained to declare that judgment should be entered for the plaintiff in the suit.

SMITH J. In this case my opinion is in favour of the defendant.

I consider the mortgage as if it had never existed, and that this was a conveyance of the estate on the 20th *August* 1800, the day on which the assignees of *John Shields* executed the release of the equity of redemption, to *John Hallowell*, in trust to secure a debt to *Thomas Greeves;* or rather a conveyance in trust for *Thomas Greeves*. After the legal estate was vested in *Hallowell* in trust, he lent the notes in question to *Greeves*, and ultimately paid them for him.

In *England* if there is a first mortgagee, and then a second, and the first lends more money on a third mortgage, he as third mortgagee shall be preferred to the second, because it shall be presumed that he lent his money on the security of having the first mortgage. Is it not equally reasonable to presume in this case, that the defendant lent his notes to *Greeves*, which he afterwards paid, on the security of this estate being conveyed to him; especially as it is not stated nor contended, that there was any other consideration inducing the defendant to lend the notes; nor that he took any counter security from *Greeves* when he gave him the notes.

It is worthy of remark, that it is not stated that the defendant had any authority from *Greeves* to take the mortgage, (if it must be mentioned) or the release of the equity of redemption which, joined to the mortgage, operated as a conveyance. If he had not, the principal was not obliged to accept such conveyance, and by taking it *Hallowell* made himself liable for the debt. It is not stated that *Greeves* ever called on the defendant to release the trust estate to him, to exonerate him from such liability. It is true that *Greeves* afterwards received the rents and profits, it is equally true that the deeds remained in the possession of the defendant.

That a factor has a lien *on all consignments* for the general balance due to him from his principal, is settled law; and I confess I cannot distinguish between a factor, agent, or *trustee*, as

to this purpose; each advances his money, each is presumed to advance it on the goods pledge or security in his possession. A. borrows 200*l.* on the pawn of jewels; afterwards he borrows of pawnee three other sums, for each of which he gives his *note* without taking notice of the jewels. Pawnor dies; his executors shall not redeem the jewels without paying the money due on the notes; for it is natural to suppose the pawnee would not have lent those sums, but on the pledge he had in his hands before. So if the first sum had been secured by mortgage. *Prec. Chan.* 419. It is a rule that *cestui que trust* ought to save trustee harmless as to all damages relating to the trust; so within the reason of that rule, where the trustee has honestly and fairly, without any possibility of being a gainer, laid down money by which *cestui que trust* is discharged from being liable to the whole money, trustee ought to be repaid. *Balsh* v. *Hyham.* (a) I have ever since the trial of *Cecil's lessee* v. *Korbman,* (*Peters*) at *York* Nisi Prius, *June* 1788, believed this lien to extend to trustees. There it was contended, that the inquiry of the referees should be confined to the tract of land for which the ejectment was brought; but it was ruled by the court, that the reference should be general, that the referees should settle how much the trustee (*Peters*) had expended about that and all other tracts, as to the two thirds of which he was trustee, under the purchase from *Ambrose Draper;* and that upon the payment of the general balance due on all, the trustee should convey to *Cecil* two thirds of the tract in question.

BRACKENRIDGE J. concurred in opinion with SMITH J. and accordingly,

Judgment for Defendant.

(a) 2 *P. Wms.* 455.