IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

MIDDLE DISTRICT, MAY TERM 1841.

## Presbyterian Congregation *against* Johnston.

Watt & S.
1ws   9
195   433

Watts &
Sergeant
1ws       9
222      2586

It is not an implied condition of the grant in trust for the unincorporated congregation by the style of "The Society of English Presbyterians and their Successors in and near the Borough of York," that it shall remain connected with any particular church judicatory: therefore, Ruled, That when the General Assembly of the Presbyterian Church in the United States was divided into two distinct fragments, each declaring itself to be the true General Assembly, the persons composing the majority of this congregation did not forfeit their interests in the trust by refusing to acknowledge the authority of either of the conflicting judicatories.

An equitable right to the possession of land is sufficient to enable a plaintiff to recover in ejectment.

A *cestui que trust* entitled to the enjoyment of the possession of land, may maintain an ejectment to recover it in his own name, either against the trustee or a stranger.

ERROR to the special court of *York* county.

This was an action of ejectment by the Trustees of the English Presbyterian Congregation of the Borough of York, against James Johnston, Samuel Small, Philip A. Small, Jacob Emmett, John Evans, William R. Morris, Rev. Benjamin I. Wallace, and Mrs. Sarah Franklin, to recover a church and two acres of land in the borough of York.

I.—2                                                            (9)

[Presbyterian Congregation v. Johnston.]

The plaintiffs gave in evidence the following deed, and charter of incorporation:—

This indenture made the twenty-ninth day of September in the year of our Lord one thousand seven hundred and eighty-five, between the honourable John Penn, Junior and John Penn of the city of Philadelphia in the commonwealth of Pennsylvania, Esquires, late proprietaries of Pennsylvania of the one part, and George Irwin, merchant, William Scott, Esquire, and Archibald M'Lean, Esquire, all of the town of York in the county of York in Pennsylvania, of the other part: Whereas there is a lot or piece of ground situate on the north side of High street in the town of York aforesaid, beginning at a corner of the said High street and Queen street, and from thence extending along the easterly side of the said Queen street to a corner of a certain twenty foot alley, thence along the southerly side of the said alley to the line of land late of Bartholomew Maul, now in the tenure of John Hay, Esquire, thence along the said line southerly to the said High street, thence along the northerly side of the said High street to the place of beginning. And whereas the said George Irwin, William Scott and Archibald M'Lean, on behalf of themselves and other members of the religious society of the English Presbyterians in and near the said town of York in the said county of York, represented to the said John Penn, Junior and John Penn that they would be pleased to grant to the said society in fee simple for the uses hereinafter mentioned the above said lot or piece of ground as a site for a house of religious worship and a burial place for the use of the said religious society of the said English Presbyterians and their successors in and near the said town of York. Now this indenture witnesseth, that the said John Penn, Junior and John Penn, favouring the above request and as well for and in consideration of their inclination to promote piety and religion as also for and in consideration of the sum of five shillings, lawful money of Pennsylvania unto them at or immediately before the sealing and delivery hereof by the said George Irwin, William Scott and Archibald M'Lean well and truly paid, the receipt whereof is hereby acknowledged, have given, granted, bargained, sold, released and confirmed, and by these presents do give, grant, bargain, sell, release and confirm unto the said George Irwin, William Scott and Archibald M'Lean and to their heirs and assigns, all that the above said lot or piece of ground, situate in the town of York in the county of York in the commonwealth of Pennsylvania aforesaid, situate, bounded and being as the same above is described, together with all and singular the ways, waters, water courses, rights, liberties, privileges, hereditaments and appurtenances whatsoever thereunto belonging, and the reversions and remainders, rents, issues and profits

thereof, and all the estate, right, title, interest, property, claim and demand whatsoever, of them the said John Penn, Junior and John Penn and their heirs respectively of, in, and to the hereby granted or mentioned to be granted premises, to have and to hold the said described lot or piece of ground, hereditaments and premises hereby granted, or mentioned to be granted, with the appurtenances, unto the said George Irwin, William Scott and Archibald M'Lean, their heirs and assigns for ever. In trust nevertheless for and as a site for a house of religious worship and a burial place for the use of the said religious society of English Presbyterians and their successors, in and near the said town of York in the county of York, and in confidence that they the said George Irwin, William Scott and Archibald M'Lean, and the survivor of them, their and his heirs and assigns, shall and will permit and suffer the said lot or piece of ground and premises, and the buildings thereon hereafter to be erected, to be from time to time and at all times hereafter, for ever at the disposal and under the care, regulation and management of the said religious society and their successors in and near the town of York aforesaid, and to and for no other use, intent or purpose whatsoever. In witness whereof, the said parties have interchangeably set their hands and seals hereunto. Dated the day and year first above written.

JOHN PENN, JUN. [SEAL].<br>
JOHN PENN. 　 [SEAL].

The Congregation of the English Presbyterian Church in the borough of York in the county of York and state of Pennsylvania, citizens of the said state, being desirous of being incorporated, and enabled as a body corporate and politic to receive and hold such charitable donations and bequests as may from time to time be made to the society, and vested with such powers and privileges as are enjoyed by the religious societies which are incorporated in the state of Pennsylvania, have agreed on the following articles and provisions, as the terms of their incorporation, that is to say,

Article 1. That the Reverend Robert Cathcart, William Harris, John Forsyth, John Greer, William Barber, James Johnson, and Penrose Robinson, and their successors, duly elected and appointed, as herein afterwards provided, be made and constituted a corporation, and body politic in law and in fact, to have continuance for ever hereafter, by the name, style and title of "The Trustees of the English Presbyterian Congregation in the Borough of York."

Article 2. That the said corporation and their successors shall for ever hereafter be capable in law, to take, receive, hold and enjoy all lands, tenements, rents, annuities, hereditaments, moneys,

and other estates, property and effects, which shall be given, granted, devised, bequeathed, sold or conveyed to them.

Article 3. That the rents, profits, and interest of the real and personal estate, to be acquired, held and enjoyed by the said congregation, shall be from time to time applied by the said trustees and their successors, for the maintenance and support of the gospel ministry in the said congregation, for repairing and maintaining their house of public worship, lots of ground, burial ground, and such charitable and pious uses, as shall be thought just and right by the trustees of the corporation for the time being.

Article 4. That the trustees aforesaid, or their successors, may at any time or times hereafter sell and dispose of any real or personal estate of the said corporation, provided that it will be necessary, before any real estate shall be sold, to obtain the consent of a majority of the contributing members of the congregation, or of a majority of so many of them as shall attend a meeting to be held for the purpose, after due notice given, and provided also that the trustees or their successors, shall not sell, grant, or otherwise part with any part of the real or personal estate, vested in the corporation, or in any wise charge or incumber the same, except for the uses or purposes aforesaid.

Article 5. The trustees shall have power to appoint a treasurer and secretary, and they shall meet, either on their own adjournments, or on notice from the pulpit, or on regular notice to every trustee, and they shall have power to elect from among themselves a president, who, together with the treasurer and secretary, shall be removeable at pleasure.

Article 6. That the trustees, or a majority of them, met as herein before directed, shall be authorized and empowered to make rules, by-laws and ordinances, and to do every thing needful, for the management of the secular affairs of the said congregation, provided such by-laws, rules and ordinances shall not be repugnant to the constitution and laws of the United States, nor of the state of Pennsylvania, and that all their by-laws, rules and ordinances, and other proceedings, shall be kept and entered in a book, which shall at all times be open to the inspection of the members of the congregation.

Article 7. That the said corporation shall have power, (they and their successors,) to make and use one common seal, with such device and inscription as they shall think proper, and the same to break, alter, and renew at their pleasure.

Article 8. That the said corporation, by the name, style and title aforesaid, shall be able and capable in law, to sue and be sued, plead and be impleaded, in any court, or before any tribunal, having competent jurisdiction of the cause of action, in all manner of suits, demands, causes or complaints, as fully and effectually, as any other person or persons, bodies politic or corporate, within the commonwealth of Pennsylvania, may or can do.

[Presbyterian Congregation v. Johnston.]

Article 9. That on the first Monday of May in each year hereafter, the congregation shall elect by ballot, or otherwise, six members thereof as trustees, who shall hold their offices for one year, and until their successors shall be duly elected, but no persons or person, except contributing members of the congregation, shall be eligible, or entitled to vote at such elections, except the pastor of the congregation, who shall always be both eligible and entitled to vote.

Article 10. That if a vacancy happens by death, resignation, or otherwise, the remaining trustees shall elect a suitable person to supply the vacancy, until the next annual election.

Article 11. The clear yearly value, interest, or income, of the real and personal estate of the said corporation, shall not at any time exceed the sum of five hundred pounds Pennsylvania currency.

In order to show the origin and continuity of the congregation, the plaintiffs gave in evidence as follows :—

April 1761. Supplication from York and Shrewsbury for Mr Hanna as their constant supply for one year.

April 1761. Supplication from York for Mr Hanna, and they are informed that they cannot be indulged, because Mr Hanna is not under our care.

Record of Carlisle Presbytery, April 1765.

Supplications from York and Shrewsbury for Mr Long to supply them a year equally divided, to pay £50, and they request that *his ordination be hastened.*

Mr Long complies, and York congregation delivers to Mr Long subscription list. April 25th, 1765.

John Hay sworn.

I have known the lot and premises on which the Presbyterian church parsonage, &c., stand, between 30 and 40 years. What denomination of Christians have been in possession of these premises ? They were called the Presbyterian church. The English Presbyterians ? Yes. I do not know of any other English Presbyterian church in or around the borough of York but this. I knew George Irwin. I think he went up to this Presbyterian church. I was acquainted with William Scott, lived neighbour to him. I think he was a Presbyterian. I don't know Archibald M'Lean, I just remember him—don't know where he worshipped at. So far as I know, the English Presbyterians *have been in* possession of those premises ever since.

Cross-examined.

The Presbyterians so far as I know are in possession now—the same persons that were in possession formerly. Mr Cathcart used to preach there until a few years past. One Mr Wallace preaches there now. How do you know it was a Presbyterian church ? Because it was called so. How do you know it is a

[Presbyterian Congregation v. Johnston.]

Presbyterian church now? Because it is called so. I know Mr James Johnston of this place. Have known him for 20 years or more, can't just say how many.

John Stroman affirmed.

The lot of ground where the church is, was occupied by the Presbyterians ever since I knew it, at least it was so said. I can't particularize the year, but I think it was between 1785 and 1790. They were called the English Presbyterian church. I was very well acquainted with George Irwin. I believe he attended that church as far as I know. I knew William Scott very well. He attended at that church also. I knew Archibald M'Lean. I think he attended that church, I could not positively say, but I think he did.

Cross-examined.

I don't think William Scott is living; he went from here to Adams county, and I think he died. M'Lean and Irwin are dead. The church is now occupied by the Presbyterians. It is called the Presbyterian church, just as it was always, so far as I know.

Resolution of 16th of Oct. 1838:

At a meeting of the English Presbyterian congregation of the borough of York, in the church, at half-past seven o'clock in the evening of Tuesday, the 16th October 1838—Dr William M'Ilvain was called to the chair, and E. M. Donaldson appointed secretary.

The meeting was opened by prayer, by the Rev. Mr Wallace. The following proceedings of session and the call of the congregation were then read, viz:

"Whereas the following preamble and resolutions have been received from the Presbytery of Carlisle, viz:

"Whereas the congregation of York appointed a commissioner to apply to this Presbytery for leave to present a call to the Rev. B. J. Wallace, a member of the Presbytery of Muhlenburg; which application has never been made—whereas Mr Wallace has been statedly preaching to said congregation for the last eight months, without having presented himself or his credentials to the Presbytery, or to the committee of Presbytery appointed to examine the credentials of travelling ministers: And whereas there is reason to apprehend that that congregation will receive injury by this state of things continuing: Therefore, Resolved—

"1. That in the judgment of this Presbytery, Mr Wallace has been acting in an irregular manner.

"2. That the stated clerk write to the Presbytery of Muhlenburg, and inform them of Mr Wallace's conduct, and the opinion of this Presbytery respecting it.

"3. That a copy of the above preamble and resolutions be sent by the stated clerk to Mr Wallace and the session of the congregation of York."

And whereas Mr. Wallace has requested that the congregation may be convened to consider said preamble and resolutions, and to take such action upon them and any matters growing out of them, as may seem to them best : Therefore, resolved, that said request be granted, and that a meeting of the congregation be held, for the above purpose, in the church, on Tuesday evening, the 16th instant, at half-past 7 o'clock.

Resolved, That foregoing proceedings of session be published to the congregation on next Sabbath at the morning and evening service.

The Rev. B. J. Wallace, the pastor elect, addressed the congregation at length. E. M. Donaldson made a short statement, accounting for his present opposition to Rev. Mr Wallace, and concluded by offering the following resolution, viz :

Resolved, That this congregation, for nearly the whole period since its organization, having been in connexion with the Carlisle Presbytery, ought not to be separated therefrom—which being seconded, was debated.

After some discussion Dr M'Clellan moved to postpone further consideration of the same, for the purpose of introducing the following resolutions as a substitute, viz :

Resolved, That this church and congregation continue to recognise the confession of faith of the Presbyterian church of the United States of America, as containing the system of doctrine taught in the Holy Scriptures, and approve of the government of the same church on the basis of the constitution.

Resolved, That in studying the peace and unity of this church, and in the peculiar circumstances in which it is placed, while we disclaim any intention of becoming an independent church, we yet deem it inexpedient, for the present, to recognise the jurisdiction of any of the conflicting church judicatories which may claim authority over us—which motion, being seconded, was debated. When

The Rev. Dr Cathcart moved to set aside all the previously offered resolutions, and to substitute the following, viz :

Resolved, That the congregation are willing to continue the pastoral labours of Mr Wallace, and permit him to remain unconnected with any Presbytery for the present.

This motion not being seconded, the consideration of Dr. M'Clellan's resolutions was resumed. After debate, the question on the first resolution was put and carried. After further debate and much excitement, several motions to adjourn being made and negatived, the question on the second resolution was put and carried. So both of Dr M'Clellan's resolutions were adopted.

At this period of the meeting, Mr Hambly, looking upon the resolution just passed as an avowed determination to separate this church from the Carlisle Presbytery, informed the meeting, that he was instructed by a number of persons, members of this

congregation, who coincided with him on this subject, to offer a protest; which he asked might be received and entered upon the minutes of the meeting. He then read the protest, and tendered it to the secretary of the meeting. The protest was again read, but the meeting refused to receive it. Dr M'Clellan then offered the following resolution, viz:

Resolved, That this church and congregation cheerfully exonerate the Rev. B. J. Wallace from any charge of neglect on his part, in not having earlier obtained his certificate of dismissal from the Presbytery of Muhlenburg, Kentucky, as they believe him to have used all proper means to obtain the same. And furthermore, that this church and congregation highly approve of the ministerial labours and conduct of the Rev. B. J. Wallace since he has been among us, and believe that his talents and piety highly qualify him to promote the spiritual interests of this congregation —which, being seconded, was adopted.

Motions to adjourn made and negatived.

Dr M'Clellan then read and offered the following resolution, viz:

Resolved, That this church and congregation, while they desire that, for the present, no change shall take place in the ecclesiastical relations of their minister, the Rev. B. J. Wallace, are willing, should circumstances render it absolutely necessary, that he should seek such connexions as will afford him requisite ecclesiastical protection—which, being seconded, was adopted without debate.

The meeting then (11 o'clock) adjourned under much excitement.

WM. M'ILVAIN, *Chairman.*

E. M. DONALDSON, *Secretary.*

*York, 9th Nov.* 1838.

To "The committee appointed by the Presbytery of Carlisle, at its late meeting in the city of Lancaster, to visit the English Presbyterian church in York, to confer with the officers and members of said church."

Rev. Brethren!

Your note was just handed me by Mr Mason, and I hasten to inform you of the following order taken by the session of "the English Presbyterian Church in York," viz:

Whereas, Mr Peter M'Intyre, a member of session, has informed us that the Presbytery of Carlisle, in session at Lancaster, have appointed a committee to visit York with reference to the recent transactions in our congregation, and whereas said committee have sent a verbal notice through Mr M'Intyre, that they are about to make said visit—

Therefore, Resolved, That the clerk of session furnish said committee with a copy of the proceedings of the congregation,

adopted at their meeting on Tuesday evening, the 16th ultimo. The proceedings referred to are herewith inclosed.

Wm. M'Ilvain, *Clerk Sess'n.*

N. B. In reference to opening the church, the Trustees are the proper persons to apply to.

To Rev. J. C. Watson,
　　Rev. H. R. Wilson.

Rev. Sirs,—I received your note this morning, and noted the contents.

The Board of Trustees at their last meeting decided against opening the church for the committee. Should, however, the majority of the trustees desire a meeting, I will call one; in conversation with four of the six trustees this morning, they are still disposed to adhere to the former decision. With much respect,

Jas. Johnson,
*President of the Board of Trustees.*

York, *Nov.* 29, 1838.

The plaintiffs' counsel requested the court to charge the jury upon the following points:

1. That the deed of John Penn, Jr., and John Penn, dated September 1785, (in evidence in this case,) to George Irwin *et al.* in trust for the English Presbyterians and their successors, in and near the town of York, and in confidence that the said George Irwin and others, and the survivor of them, their and his heirs and assigns, shall and will permit and suffer the said lot or piece of ground and premises, and the buildings thereon hereafter to be erected to be from time to time and at all times hereafter, for ever at the disposal and under the care, regulation, and management of the said religious society, and their successors in and near the town of York aforesaid, and to and for no other use, intent or purpose whatsoever, created a trust of which none can avail themselves but such as hold to the same church government and ecclesiastical connexion as the English Presbyterians in and near the town of York were governed by, at the time of the creation of that trust.

2. If the jury believe that the English Presbyterians in and near the town of York, at the time when the aforesaid deed of the Penns was executed, were ecclesiastically subject to the Donegal Presbytery, and that the Donegal Presbytery was afterwards merged into the Carlisle Presbytery, no one can claim an equitable interest under that deed unless ecclesiastically subject to the jurisdiction of the Carlisle Presbytery, or lawfully discharged from that jurisdiction by competent authority.

3. That the resolution adopted by the defendants and those they represent on the 16th of October 1838, to wit: " Resolved, That in studying the peace and unity of this church, and in the

I. — 3　　　　B *

peculiar circumstances in which it is placed, while we disclaim any intention of becoming an independent church, we yet deem it inexpedient for the present to recognise the jurisdiction of any of the conflicting church judicatories which may claim authority over us"—with the subsequent refusal of the Church Session, and trustees of the congregation represented by the defendants, to open the church on the 29th of November 1838, to a committee of Carlisle Presbytery, and the connexion of themselves as a congregation with the Third Presbytery of Philadelphia, and afterwards with the Harrisburg Presbytery, without the consent of the Carlisle Presbytery, or that of the Synod of Philadelphia, was a secession from the Presbyterian Church, and a forfeiture of all right to any beneficial interest under the aforesaid deed of the Penns.

4. That the resolution of the 16th of October 1838, before recited, was on the part of the defendants a rejection of the jurisdiction of the Carlisle Presbytery, to which before they were lawfully subject, and a destruction of the Presbyterian connexion of the defendants, rendering them an independent congregation, and so disabled from claiming under the aforesaid deed in trust for English Presbyterians.

5. That the union of the defendants as a congregation, with the Third Presbytery of Philadelphia, after that body was dissolved, without the authority of the Synod of Philadelphia, to which the Presbytery of Carlisle was subject, was a secession from the Presbyterian Church, to which they had heretofore been subject, and a forfeiture of any interest which they had in the trust created by the deed of the Penns.

6. That the election of the defendants' trustees on the first Monday of May 1839, was vitiated and irregular, because James Johnson, Esq., the judge, and William R. Morris, the clerk on that occasion, were both voted for and elected trustees.

7. That no *feme covert* is entitled to vote at the charter election of trustees of the English Presbyterian Congregation in the borough of York, and the reception of such votes is illegal, and renders such election void.

8. That a *cestui que* trust can maintain an action of ejectment against the wrong doer, and that the defendants in such suit cannot set up the title of the trustees to defeat the plaintiff.

9. That if the trustees, or either of them, of the English Presbyterian Congregation of the borough of York, the plaintiffs in this cause, were contributors, and duly elected by contributors, of at least six months' standing, which contributors had paid their dues on or before the first Monday in May 1839, they and those they represent were *cestuis que* use under the deed of John Penn and John Penn Jr., and can maintain a suit in the corporate name, and recover against the defendants, who will not be permitted to set up the title of the trustees to defeat the claim.

10. That if the trustees of the English Presbyterian Congregation in the borough of York, or either of them, were contributors, and duly elected trustees by contributors of at least six months' standing, whose dues were paid on or before the first Monday of May 1839, they were the landlords of Mrs Franklin and B. J. Wallace, and they cannot contest the plaintiffs' title.

11. That the defendants, not being contributors to the English Presbyterian Congregation in the Borough of York, could not be elected trustees of the English Presbyterian Congregation of the Borough of York.

12. That although no deed from George Irwin, William Scott, and Archibald M'Lean, or either of them, has been given in evidence in this cause, yet as there is proof of the possession of the English Presbyterian Congregation in the borough of York of the premises aforesaid, for fifty years, accompanied with evidence of acquiescence on the part of the trustees aforesaid, the jury shall presume a conveyance from the said Irwin, Scott and M'Lean, to the said congregation by their chartered name.

13. That if Thomas M'Grath, Calvin Mason, Thomas Kelly, Samuel M'Dowel, and John A. Wilson, were elected on the first Monday of May, 1839, by contributors to the English Presbyterian Congregation in the borough of York, being trustees *de facto*, they might bring an action in the name of the corporation, and recover against a wrong doer.

14. That the deed of John Penn Jr., and John Penn, in evidence in this cause, contains a grant of land for the use of the English Presbyterians in and near the town of York, was a grant for a charitable use, and it is not competent for a majority of the English Presbyterians in and near the town of York to divert that grant to any other purpose than that designated by the grantors.

15. That if Mrs Franklin and Mr Wallace entered on the aforesaid premises under .the title of the trustees of the English Presbyterian Congregation in the borough of York, they are *quasi* tenants of the plaintiffs, and cannot contest the title of their landlords.

16. That this action of ejectment being in its nature a possessory action, it is not requisite that the legal title should be in the plaintiff to enable him to recover in this action, provided the right of possession be in the plaintiffs.

The defendants' counsel requested the court to charge the jury upon the following points:

1. That there is no title to the property for which this suit is brought, in the corporation which is plaintiff, and therefore plaintiffs cannot recover.

2. That if the title were in the corporation, yet the trustees are to be elected by a majority of the contributing members of the congregation, irrespective of their ecclesiastical relation or religious belief, and whatever effect such relation or belief might have

[Presbyterian Congregation v. Johnston.]

on the *beneficial* interest in the property, the legal title must remain in the trustees of the majority until devested by due course of law, and therefore the plaintiffs cannot recover.

3. If it be true, as the plaintiffs allege, that the vote of the 16th Oct. 1838, at the congregational meeting, severed the ecclesiastical relation of the congregation, *that* vote affected the *body*, the *minority* as well as the *majority*, and both were equally cut off from the Presbytery in the manner the plaintiffs pretend.

4. That when religious societies possessed of real estate within this commonwealth, vest the legal title in trustees, in the manner mentioned in the act of 1730, the beneficial interest remains in the society at large; and if, according to the principles of that society, a majority must govern, that majority must control the disposition of the property; and so long as they professedly adhere to their original principles, no power can take away their property, whatever be their ecclesiastical relations, provided they are not at variance with their profession.

5. The plaintiffs allege that they are the lawful trustees, and not the defendants. Who are the lawful trustees is a question that cannot be tried in an action of ejectment, and therefore the plaintiffs cannot recover.

6. That so long as the defendants answer the description of the *cestuis que* trust in the deed, and use the property conformably to the trust there declared, they cannot be deprived of their right to the property.

The court thus charged the jury :—

HAYS, President.—A division having occurred in the English Presbyterian Congregation in the borough of York, this action has been brought by, or on behalf of those members who left the church and have since met for public worship in this court-room, against the defendants, who, with the rest of the congregation, continue to occupy the church, for the purpose of recovering the property described in the writ, and which may be designated as the church, burial-ground, and parsonage, situate on the north side of High street, and east side of Queen street, commonly known as the property of the English Presbyterian Congregation.

The plaintiffs' statement alleges that the defendants have this property in their possession, and the fact is confirmed by the return of the writ and all the testimony in the case. But they aver that the right of property and possession is in them, and not in the defendants; which averment, and the denial of the defendants by their plea of not guilty, constitute the issue that you are trying.

According to the principles of the action of ejectment, the plaintiffs are bound to make out by good and satisfactory evidence the truth of their averments, that the right of title or possession is in them, otherwise they cannot recover. To prove that the title is in a third person, and not in the defendants, would as effectually

defeat the recovery by the plaintiffs, as the clearest evidence of title in the defendants. This rule, however familiar, it is important to state.

In presenting their case to the court and jury, the plaintiffs gave in evidence, first, the charter incorporating the English Presbyterian Congregation in the borough of York, which, having received the governor's certificate on the 7th Dec. 1813, took effect from that day. They next presented the deed from John Penn, Jr., and John Penn, to George Irwin, William Scott and Archibald M'Lean for the land now in question. This deed is dated the 29th September 1785. It conveyed the premises to George Irwin, William Scott and Archibald M'Lean, their heirs and assigns in trust for and as a site for a house of religious worship, and a burial-place for the use of the religious society of English Presbyterians and their successors in and near the borough or town of York.

Both the parties to the action found their titles upon this deed and the charter. It was therefore competent for the plaintiffs in exhibiting their title, to begin with these documents. The religious society for whose use the grant was made, must have existed for twenty years, and perhaps longer, before the deed was executed.

We have evidence of applications from York to the Donegal Presbytery, and of supplies being appointed for York as early as the years 1762 and 1764. From the terms of the deed, as well as from the evidence just referred to, we may conclude that persons calling themselves, and called by others, Presbyterians, residing in and near this town, about the year 1785, and who spoke the English language, did, either at stated intervals or occasionally, meet together for public worship, and were hence designated as a society of English Presbyterians. It appears that not only before the grant of Messrs. Penn, but for several years afterwards, the English Presbyterians of York continued to make application for and receive supplies of ministers to preach for them. First from the Donegal Presbytery, and subsequently from the Presbytery of Carlisle; until at length a call was presented to the Rev. Mr Cathcart, by permission of the latter Presbytery, then of Philadelphia. After certain preliminaries, that gentleman was installed as pastor of the united congregations of York and Round Hill, in October 1793. He came to York in the spring of that year, and attached himself to the Presbytery of Carlisle. The brick church was already erected, though it was not completed. But the congregation was very small: I think the doctor described it as a mere skeleton. A treasurer was appointed, not without considerable difficulty in getting any one to serve, and elders were constituted of such materials, to use his expression, as were at hand. The congregation would seem to have managed their small concerns, from the time he came among them, until 1812 or 1813,

without any particular attention to forms.   During all this period there never was a congregational meeting held for the management of their secular concerns.   But every thing was harmoniously conducted, and for thirty years, not a murmur or dispute was known.   The property and pecuniary affairs of the congregation were managed by a few active individuals among them, who informally obtained the consent of the rest.   In this way was the grant of Messrs. Penn secured, as is evident from the recital of the deed, which runs thus: "Whereas, the said George Irwin, William Scott, and Archibald M'Lean, on behalf of themselves and other members of the religious society of the English Presbyterians in and near the said town of York, in the said county of York, represented to the said John Penn, Jr., and John Penn, that they would be pleased to grant to the said society in fee simple, for the uses hereafter mentioned, the above said lot of ground, as a site for a house of religious worship and a burial-place for the use of the said religious society of the said English Presbyterians, in and near the said town of York," &c.   In the years 1812 and 1813, the congregation having probably increased in numbers and means, procured the charter of which we have spoken.   The parsonage was built in 1817.   Dr Cathcart moved into it the next year, and occupied it until the close of his pastoral connexion with the congregation.

This congregation or society of English Presbyterians, has existed, so far as its history may be traced by the testimony, for a period of eighty years and upwards; and from very feeble beginnings, rose by slow degrees to the condition of supporting a resident pastor by its annual contributions.   It is still a small congregation, and its disunion is, on that account, the more to be regretted.   When by the charter referred to, it assumed a corporate capacity, the management of its property, real and personal, and all its temporal concerns, was devolved by the "terms of the incorporation," on the trustees, who were to apply the rents, issues, and profits of the corporation, and might sell and dispose of any of its real and personal estate, thereafter acquired, with the consent of a majority of the contributing members, attending a meeting to be held for the purpose :—who were also to appoint a secretary and treasurer, make by-laws, and "do every thing needful for the management of the secular affairs of the congregation."   Under the charter, then, the trustees have held and managed this church property, and the temporalities of the congregation, since 1813; and we have not heard of any difficulties or disagreements, until the year 1838.   A regular succession of trustees was elected each year, on the first Monday of May, agreeably to the charter.   The congregation, it is not denied, was complete in its organization in the year 1838, up to the 16th Oct., six trustees having been duly elected on the first Monday in May, to serve for one year.   From the time of Dr Cathcart's installa-

tion as pastor, there had been an ecclesiastical connexion with the Carlisle Presbytery, kept up by his regular attendance, (sometimes, but not often, accompanied by one of his elders) at the sittings of that presbytery, until he resigned his pastoral charge. I call it an ecclesiastical connexion, to intimate the absence of any pretensions of right or control by the presbytery, over the property of the congregation or its temporal concerns.   I am not aware from any thing that has transpired in the course of our investigations that any presbytery has ever exercised, or distinctly claimed such a right.   I take the term " watch and care," as used by the presbyteries in relation to the congregations attached to them, to mean a spiritual supervision.   About the time of Dr Cathcart's withdrawal from his pastoral labours, the elements of discord, which had been agitating the Presbyterian church or community, produced a commotion in Philadelphia, which dismembered their church government.   The consequence is, that there are now two organized bodies, each calling itself the General Assembly of the Presbyterian Church of the United States of America; each having its constituent synods, presbyteries and sessions; and each claiming to be *the* General Assembly—the only General Assembly of the Presbyterian Church.   Each declares its belief in the Westminster Confession of Faith, and its adherence to the Presbyterian form of church government.   The congregations of the country are distributed between them.   In a civil sense, there is no incompatibility in the co-existence of both these bodies or governments as independent judicatories within the same territorial limits.   That they do thus co-exist, is a fact indisputable; and it is not to be doubted, that they will continue to do so, whatever names they may ascribe to themselves or to each other, or whatever construction the one may put upon the other's proceedings.   This dismemberment having occurred, the establishment of new synods and presbyteries followed; among which are the Synod of Pennsylvania, and the Presbytery of Harrisburg, which were constituted by the General Assembly that met in the first Presbyterian Church in Philadelphia.   The Carlisle Presbytery adhered to that which met in Ranstead court.

We come now to the 16th of October 1838, and the meeting of the Presbyterian congregation of this borough on the evening of that day.   It is not necessary to detail the proceedings, nor to dwell upon them.   A resolution was adopted declaring it " inexpedient for the present to recognise the jurisdiction of any of the conflicting church judicatories which might claim authority over them;" in consequence of which a part of the congregation left the church, I mean the building and the pastor, and have continued to meet elsewhere since that time.   The majority, and I think it is admitted a large majority, of the contributing members of the congregation remained, and have continued to worship as they had done before, in the church.   The members composing

this majority have also continued to elect trustees according to the charter, viz: on the first Monday in May 1839, and on the first Monday in May 1840; whilst those of the minority who withdrew from them, have likewise elected the same number of trustees, on the same days. These latter trustees, who were elected for 1839–40, are the plaintiffs in the present cause, and the former, elected by the contributing members in the church for 1839–40, are the six defendants named in the writ.

Two questions arise: first, whether the persons so elected by those members who left the church building, are the trustees of the English Presbyterian Congregation in the borough of York; second, whether they can maintain an action of ejectment upon the title which they have laid before us.

In relation to these questions, I may adopt the language of the supreme court in Unangst *v.* Shortz, 5 *Whart.* 519, and say that to determine the rights of persons claiming as members of this congregation, or as the corporation, there is no other guide than the deed of the 29th September 1785, and the charter of the 7th December 1813. The deed is a grant for the land for which this suit is brought, to George Irwin, William Scott, and Archibald M'Lean, their heirs and assigns, in trust for the uses before mentioned. Thus conveying to those grantees in trust for the uses aforesaid, the legal title in the premises, vesting in them the legal estate, with the legal remedy appertaining to it, and the capacity to transmit the title to heirs or new trustees, by assignment. They never did assign or grant over the estate. It was transmitted to their heirs, and with them it remains. The trustees of the English Presbyterian Congregation in the borough of York, or rather the congregation themselves, merely hold as *cestuis que trust,* the equitable right to occupy, use, and enjoy the land conveyed by the deed for the uses therein described. The freehold and possession passed to the grantees by virtue of the deed, and were transmitted to their heirs. The occupation of the congregation as *cestuis que trust,* is under this possession of the trustees in this deed. It is in consistency with their title and in subservience to it. The property is in the congregation for all beneficial purposes; but they do not possess the land in such a manner as to be capable of maintaining an action of ejectment for it, in their own names or in that of the corporation. Therefore, neither the congregation, nor the trustees as a corporation, can bring an action of ejectment for the land upon the title exhibited by the plaintiffs, and by showing the legal title to be in other persons, the plaintiffs have defeated their own suit. The decision of this point which has respect to the remedy, is conclusive in regard to the present action.

There are other considerations relative to the *right,* which commend themselves to the consideration of the parties. The foundation of every question of property, with respect to the land and

premises in question, is the deed of the Messrs. Penn, which was made, be it remembered, before the General Assembly was called into existence, or the congregation here had a pastor, for whose benefit the grant was intended, not by a name which was ordinarily, if ever, used by any presbytery, or to be more particular, by the Presbytery of Donegal, or Carlisle, so far as we are informed by their proceedings given in evidence; but by the name of " the Religious Society of English Presbyterians in and near the town of York." The term *religious societies* is one which had long before been used in an act of assembly, passed in 1730, and it is recognised in the constitutions which have been since adopted. It sprang from general usage, and was employed in the act referred to, and the constitutions, as a term of extensive classification. It is not technical, much less sectarian. In the deed, there is not one word pointing to the ecclesiastical connexion of the persons for whose use the land was conveyed, with the Carlisle Presbytery, or any other; and the adoption of the general term *religious society*, proves to my mind that nothing in regard to such connexion was intended. The only limitation of this general term is in the following words: ".English Presbyterians in and near the town of York;" the first of which was intended to designate the national origin of the religious sect, (or rather of their language) for whose use the property was granted, in order to distinguish them from the Presbyterians of the German Reformed Church, who probably at that time, as now, existed here in much greater numbers; and the latter part of the description was obviously designed to determine the locality of the *cestuis que trust*. Here, then, is a general term, excluding, if alone, the idea of a restricted meaning, connected with a limitation expressing the only restriction in the minds of the grantors. Now, the charter subsequently obtained by this religious society of English Presbyterians, is always, with respect to this grant, to be construed consistently with the deed. The society still exists; the English Presbyterian Congregation of the borough of York constitute that society. And the congregation or the society must enjoy the land granted, in subordination to the uses described in the deed. The charter cannot change the effect of the grant in any particular. The grant is a contract, the obligation of which cannot be impaired by any authority. The other question heretofore stated, is whether the persons who left the church building to worship elsewhere, and who were elected at M'Alister's school-house, are the trustees of the English Presbyterian congregation in the borough of York? Taking the charter for our guide, we refer to the 9th Art., which is in these words: " That on the first Monday of May in each year hereafter, the congregation shall elect, by ballot or otherwise, six members thereof as trustees, who shall hold their offices for one year, and until their successors shall be duly elected; but no person or persons except contributing mem-

I. — 4     c

bers of the congregation shall be eligible or entitled to a vote at such elections, except the pastor of the congregation, who shall always be both eligible and entitled to vote." The usage was always to give notice from the pulpit, on the preceding Sabbath, of the election to be held the following Monday in the church, and this usage was complied with, with regard to the election held in the church, on the first Monday in May 1838, when the defendants were elected by a majority of the pew-holders and contributing members of the congregation, then and there attending. Unquestionably there can be but one set of trustees under this charter, at the same time. If the six members then and there elected were duly and legally elected, those who were elected at M'Alister's school-room, were not.

It is not pretended that the persons remaining as worshippers in the church, did not at the time of division constitute a majority of the congregation; nor is it denied, that a majority of the contributing members of the congregation (considering that term, even as embracing those who retained possession of the church, together with those who retired from it on the 16th of October 1838, and assembled at M'Alister's school-house on the first Monday of May 1839), voted for the trustees elected in the church. It is not denied that the party remaining in the church was, and still continues to be, a large majority of the original congregation of 1838. According to the terms of the 9th Article, then, the trustees elected there were duly elected, provided they were eligible and the voters were qualified; or a sufficient number were qualified to constitute a majority of the contributing members. The ground taken on the part of the plaintiffs, in support of their position, that those persons were not duly elected, is that those persons, as well as the voters who elected them, had ceased to be the congregation " of the English Presbyterian congregation in the borough of York," in consequence of the resolution adopted on the 16th of October 1838, declaring it to be inexpedient to recognise the jurisdiction, for the present, of any of the conflicting church judicatories which might claim authority over them, and of their subsequent connexion with the Third Presbytery of Philadelphia, and the Harrisburg Presbytery; in short, because they refused to continue their ecclesiastical connexion with the Carlisle Presbytery. For this cause, it is contended, that they were no longer the congregation of the English Presbyterian church, and that this description is applicable to the plaintiffs and their party alone. This involves a question of church government with reference to two ecclesiastical judicatories; and I find nothing in the charter to warrant the raising of the question, or to solve it. In the interpretation of charters, as of other contracts, words are to be construed in their ordinary, popular, and grammatical sense; and here, a congregation is, according to common acceptation, a number of families and individuals, who come

[Presbyterian Congregation v. Johnston.]

together at stated times in a church, or other appointed place, for the purpose of divine worship.

The English Presbyterian church in the borough of York means the church erected on the hill upon this street in contradistinction to the German Reformed church, which is west of the court-house, or the English Episcopal, and other churches distributed over town. Accordingly, Mr Hay and Mr Stroman, the two venerable witnesses introduced by the plaintiffs, both stated that they had known the property on which the Presbyterian parsonage stands, the one from thirty to forty years, and the other for more than fifty years, and that the denomination of Christians who had been in possession of it were called the English Presbyterian church. Mr Hay said that he knows the English Presbyterians have been in possession of the premises ever since he first knew them, and are so now. Mr Stroman said the church is now occupied by the Presbyterians. It is called the Presbyterian church just as it was always, so far as he knows. As I intimated, there is no reference in the charter to any church judicatories or ecclesiastical connexion. Even the judicatory peculiar to the congregation is not mentioned or alluded to. I mean the session. This charter is a mere legal creation for the purpose of receiving and holding such donations and bequests as might be made to the congregation from time to time; and what is remarkable, all its provisions, with respect to such property, are prospective. In my opinion, therefore, the plaintiffs' position cannot be sustained, and the congregation of the English Presbyterian church did exist after the proceedings referred to, composed of those members who continued in possession of the premises in dispute, and who still are in possession. And if it be shown that a majority of the contributing members, at the elections which have taken place in the church, voted for the trustees who were elected there, and that those trustees were also contributing members of this congregation, then are they duly elected according to the charter, and they were the legal trustees of the English Presbyterian congregation in the borough of York. It would follow that the persons who were elected at M'Alister's school-room were not the trustees of the English Presbyterian church in the borough of York, and consequently had no right to sue as such.

The members of the congregation still call themselves, and are called by others, a congregation of the English Presbyterian church. They profess the faith of the Presbyterian church. Their form of government is that which is recognised everywhere as the form of the Presbyterian church; and having established an ecclesiastical connexion according to that form, I cannot perceive how they can be supposed to have forfeited the privileges of the charter.

The court thus answered the plaintiffs' points.

1. There is no recognition in the deed of any special or particular church government; and I am of the opinion that all may

avail themselves of the benefits of the trust who come within the description of *cestuis que trust* in this deed; as is fully explained in the charge.

2. The ecclesiastical subjection herein referred to, constitutes no part of the description of those persons who were made *cestuis que trust* by this deed, as I have explained at length in the general charge; therefore it does not affect their right to the enjoyment of the property conveyed to their use.

3. I cannot think so—because there is nothing in the deed that refers to the government of the church, and the deed is older than the General Assembly: For further answer, I refer you to the general charge.

4. The deed was made before the congregation existed as an organized body—before it had a pastor, and without any reference to an ecclesiastical connexion. The dissolution of any such connexion, therefore, does not interfere with the rights of the *cestuis que trust*, who are described as the religious society of English Presbyterians.

5. The same answer is applicable to this point, and with more force.

6. These circumstances create no disability. If they were members and contributing members of the congregation, they were eligible under the charter.

7. The reception of such votes would not, if illegal, render the election void, unless they were of such number as to produce a majority; but if such persons are admitted as members, and contribute as others do, I do not think they are not entitled to vote according to the charter; and if, as has been said, the by-laws of the corporation authorize the vote by families—i. e., that each family may give one vote, I cannot discover why such a vote may not be given by a *feme covert* attending the meeting for the purpose.

8, and 9. An ejectment, which is the present action, must be brought in the name of the trustees, in whom the legal estate is vested; it cannot be maintained in the name of the trustees of the congregation.

10. The first part of the proposition is true; but the tenants, being made defendants, may contest the plaintiffs' title to the name which they have assumed upon the record.

11. Were the fact true, the conclusion would follow; but it is not true that the defendants could not be elected trustees, because they did not contribute to the expenses of the part of the congregation that withdrew from the occupancy of the church and met for public worship in the court-house, as the general charge has explained.

12. The occupation of the premises by the *cestuis que trust*, has been under the possession of the trustees, in consistency and not in opposition to them, or their title. The presumption, therefore, does not arise; a conveyance cannot be presumed.

13. This has been substantially answered in answer to the 8th and 9th propositions, to which and the general charge on this subject, I refer for further explanation.

14. Answer in the affirmative.

15. They are tenants of the trustees, but are the plaintiffs those trustees? If they were the tenants of the plaintiffs, they could not of course contest the title of their landlords.

*The court thus answered the defendants' points.*

1. There is no legal title in the corporation, as has been already explained, which can enable the plaintiffs to maintain the present action.

2. Answered in the affirmative; so far as the religious belief mentioned in the point may not impair the identity of the *cestuis que trust.*

3. This conclusion would seem to follow as a logical deduction from the premises.

4. Affirmatively answered in connexion with the general charge.

5. I can perceive no legal difficulty in trying such a question in the action of ejectment, though the facts of this case are such in reference to the title, that the decision of the question is not essential to the determination of the issue.

6. This is answered in the affirmative.

Errors assigned:

1. The court erred in charging the jury that neither the Congregation nor the Trustees, as a corporation, can bring an action of ejectment for the land upon the title exhibited by the plaintiffs.

2. The court erred in charging the jury that the deed of the Penns was made before the General Assembly was called into existence, or *the Congregation here had a pastor.*

3. The court erred in instructing the jury that in the deed there is not one word pointing to the ecclesiastical connexion of the persons for whose use the land was conveyed, with the Carlisle Presbytery or any other.

4. The court erred in instructing the jury that the usage was always to give notice from the pulpit on the preceding Sabbath, of the election to be held on the following Monday in the church, and this usage was complied with with regard to the election held in the church on the first Monday in May 1838, when defendants were elected by a majority of the pew-holders and contributing members of the congregation then and there attending.

5. The court erred in instructing the jury that according to the terms of the 9th Art. the Trustees elected there (in the church) were duly elected, provided they were eligible and the voters were qualified; or a sufficient number were qualified to constitute a majority of the contributing members. The ground taken on the part of the plaintiffs in support of their position, that those persons were not duly elected, is that those persons, as well as the voters who elected them, had ceased to be the congregation "of

I. — C *

the English Presbyterian congregation in the borough of York," in consequence of the resolution adopted on the 16th of October 1838, declaring it to be inexpedient to recognise the jurisdiction, for the present, of any of the conflicting church judicatories which might claim authority over them, and of their subsequent connexion with the Third Presbytery of Philadelphia, and the Harrisburg Presbytery—in short, because they refused to continue their ecclesiastical connexion with the Carlisle Presbytery. For this cause, it is contended, that they were no longer the congregation of the English Presbyterian church, and that this description is applicable to the plaintiffs and their party alone. This involves a question of church government with reference to two ecclesiastical judicatories; and I find nothing in the charter to warrant the raising of the question, or to solve it.

6. It was error to tell the jury that the English Presbyterian church in the borough of York, means the church erected on the hill on this street.

7. It was error to tell the jury Mr Hay said that he knows the English Presbyterians have been in possession of the premises ever since he knew them, and *are so now.*

8. It was error to instruct the jury that the plaintiffs' position cannot be sustained, and the congregation of the English Presbyterian church did exist after the proceedings 16th May, 1838, referred to, composed of those members, who continued in possession of the premises in dispute and who still are in possession.

9. It was error to tell the jury that if it be shown that a majority of the contributing members at the elections, which have taken place in the church, voted for the trustees who were elected there, and that those trustees were also contributing members, then are they duly elected according to the charter, and they were the legal trustees of the English Presbyterian church in the borough of York, and that it would follow that the persons who were elected trustees at M'Alister's school-room were not the trustees of the English Presbyterian congregation in the borough of York, and had no right to sue as such.

10. It was error to tell the jury that the members of the congregation still call themselves, and are called by others, a congregation of the English Presbyterian church. They profess the faith of the Presbyterian church. Their form of government is that which is recognised everywhere as the form of the Presbyterian church; and having established an ecclesiastical connexion according to that form, I cannot perceive how they can be supposed to have forfeited the privileges of their charter.

11. There was error in the answer of the court to the plaintiffs' 1st, 2d, 3d, 4th, 5th, 7th, 8th, 9th, 10th, 11th, 12th, 15th, and 16th points.

[Presbyterian Congregation v. Johnston.]

12. There is error in the answers to the 1st, 2d, 3d, 4th points of defendants.

13. The court took from the jury the decision of the question of fact, which of the parties, if either, was the English Presbyrian congregation in the borough of York.

*Mason* and *Hambly*, for the plaintiff in error:

Two questions presented themselves to the court below: Are the plaintiffs the trustees of the congregation contemplated by the original grant and charter? And may they in that character maintain this ejectment? It must be conceded that all congregations of worshipping Christians, acknowledging the force of church government, and the obligations of obedience to church judicatories, must measure their rights by some other rule than that of the force of numbers. If there be no principle to which either party of a divided congregation may look as the test of their mutual rights, there is an end to all protection in the enjoyment of our faith; the strong will always prevail over the weak, and consequently our churches and their management must fall into the hands of those who regard the possession of the property as more important than the holy purpose to which it has been consecrated.

The benevolent donors of the property in question, designated the *cestuis que trust* by the name of " the Religious Society of English Presbyterians and their successors, in and near the town of York, in the county of York." This society was then, at the date of the grant, a congregation of worshipping Christians, acknowledging the jurisdiction of the Presbyterian church, and attached to the Carlisle Presbytery, enjoying all the advantages of that connexion, and looking to it for protection and government. At this period, then, the predecessors of the present plaintiffs were known to the grantors in the deed, and designated by their religious faith, and with all their religious connexions with the Presbyterian church; those connexions continued without interruption from that day to this; the congregation in the mean time having legalized itself by a charter. The Presbyterian church was then, as it is now, identical in its structure, faith, and form of government; and the plaintiffs in this action represent a congregation who desire that they shall not be severed from the church of their fathers; and have resorted to this remedy that their property may not be forfeited by the breach of their allegiance. It is by our faith, form of government, and ecclesiastical connexions, and not by what we may call ourselves, that we are known as a congregation. Applying the evidence in this case, then, to these admitted principles, can there be any doubt that the plaintiffs are the legitimate representatives of the " religious society of English Presbyterians in and near the town of York?" It is now a part of the history of the. Presbyterian

church, that a portion seceded and established a church and government for themselves, entirely independent of and free from the control of that government which has existed from the origin of the church, and is now, as it was then. This secession and formation of a new church, a new popular body, known only by its own government or head, is recognised by the world and by the judicial determination of this court as a new organization, a new body, entitled neither to the name or any part of the property of the Presbyterian church, as it has been from its foundation. *Commonwealth* v. *Green*, 5 *Whart.* 531. It is to this new body the present defendants belong; they disavow all jurisdiction of the Presbyterian church and its judicatories over them. The question, then, naturally presents itself, may any portion of a congregation, upon the sole ground of their being a majority in numbers, separate themselves from the rest, adopt a new faith and new government for themselves, and deprive the rest of their property? A court of equity may not enforce the faith of either party when there is a schism, but it will protect the rights of the parties as to their property, so far as it is connected with the distinctive qualifications of the trust. 9 *Wend.* 394; 15 *Mass.* 466; 13 *Mass.* 190; 16 *Mass.* 408; 1 *Pick.* 101; 1 *Greenleaf* 208; 7 *Halst.* 206.

The question, then, only remains, can the plaintiffs, as trustees, maintain this ejectment? It is clearly settled that the *cestui que trust* may maintain ejectment against a trespasser, and even the trustee himself, to enforce a possession to which he is entitled by the object of the grant. 24 *Law Lib.* 290; 1 *Yeates* 358; 1 *Binn.* 216; *Troub. & Hal.* 54; 8 *Serg. & Rawle* 115; 16 *Serg. & Rawle* 278; 5 *Watts* 423; 3 *Penn. Rep.* 426; 10 *Serg. & Rawle* 389; 1 *Watts* 78.

*Mayer*, with whom was *Chapin*, for defendants in error.

The plaintiffs' argument is, *First*, 1. The title is in the trustees for the use of the English Presbyterian Congregation, in and near the town of York. 2. The minority became the English Presbyterian Congregation, &c., by the resolutions of October 1838. 3. Therefore the title is in the trustees for the minority alone. *Secondly*, 1. The trustees are eligible from and by the contributing members of the English Presbyterian Congregation, &c. 2. The minority became the English Presbyterian Congregation, &c. by the resolutions of October 1838. 3. Therefore the trustees of the minority are the lawful trustees.

I. But the title never was in the corporation. It is in the heir at law of the survivor in the deed of the Penns. *Means & Carlisle's Appeal*, 9 *Watts* 331. Procuring the charter, passed no title. *Leffingwell* v. *Elliot*, 8 *Pick.* 455; *St. Mary's Church*, 7 *Serg. & Rawle* 531; *Comm.* v. *Jarret*, Ib. 460. Presuming a conveyance presumes a breach of trust, for the trusts of the deed and charter are different. The presumption is asked, to oust a por-

tion of the *cestuis que trust* for no tortious act, *Unangst* v. *Shortz,*
5 *Wharton* 506, but by force of the title founded on the presumption itself.

There is no possessory right in the corporation. The congregation hold the church, the pastor the parsonage. The former held before the charter. The latter came in by virtue of his office, from which he has not been deposed. If put in by the trustees and their tenant, he has a tenant's rights. Four of those trustees are defendants, were trustees before 1838, and are so still. If the corporation had possession, it is as represented by the defendants, not by the plaintiffs.

The plaintiffs concede the right of a majority to act in the congregation. It is the principle of Presbyterial government, *Confes. of Faith* 363; *Comm.* v. *Green,* 4 *Whart.* 599; and of corporate action, *Ebaugh* v. *Hendel,* 5 *Watts* 43; *Angell & Ames on Corp.* 280; *St. Mary's Church,* 7 *Serg. & Rawle* 538, 543. They also assume the competency of the majority to pass the resolutions of 1838. If void, nothing could be predicated of them. The act of the majority is the act of the body. If the majority were cut off from the church by the resolutions of 1838, so were the minority also. The effect could not be on the individual voters. Members of the congregation are not always members of the church. Mere contributors voted on both sides: and affirmative voters were no more separated from the church, than negative voters were connected with it. If the majority forfeited their right to the property, so did the minority. If the trust failed for an instant, by the forfeiture of the *cestuis que trust,* the grantors only can take advantage of it.

The resolutions purported no separation. They declare adherence to the Confession of Faith, &c. They were precautionary in a time of revolution. The ecclesiastical connexion of the congregation was only suspended; it was renewed with a body which was an integral portion of the undivided church.

Both parties are Presbyterian. The *Comm.* v. *Green,* 4 *Whart.* 531, decided a question of organization, not of orthodoxy. So the case in *Halst.* cited by plaintiffs: in the former it is said the majority of the General Assembly must govern, and the court will not inquire into the justice of their acts. This is so of the judicatories of religious sects, because their acts affect no right of property. It is not so in corporations, where secession or exclusion produces a loss of corporate rights. *Ebaugh* v. *Hendel,* 5 *Watts* 43. If the separation of a religious society, by excommunication or secession from the jurisdiction of the head of a sect, involved a loss of its descriptive name and individual property, the decrees of the judicatory would have a temporal sanction unclaimed, and unknown to the law. *Riddle* v. *Stevens,* 2 *Serg. & Rawle* 537. Secession without penalty is a right, essential to lib-

erty of conscience, and guaranteed by the constitution; otherwise, every sect would be an established religion, the decrees of whose judicatories would be enforced by the civil courts. The property of religious societies belongs to them, and not to the sect whose name they bear. *Act* 1730, *Purdon* 778. A sect, as such, can hold no property. *Meth. Church* v. *Remington*, 1 *Watts* 218. Subordination to a sect is incidental to such societies, not essential to their existence, or right to hold property. Secession or exclusion from the communion of the sect, cannot affect their property, unless it violate an express condition of their tenure. Here there was no such condition. The congregation held the property before the General Assembly existed. No particular kind of Presbyterians are named in the deed or charter. The name used is a popular, not a technical designation. The persons in possession *profess* to be a Presbyterian congregation, and the court cannot inquire further. Every man must be taken to be of that religious faith he professes, unless his actual ecclesiastical relations are at variance with his profession. The congregation of the minority, indeed, have no other basis for their Presbyterianism.

II. The *major* proposition of the second syllogism is based on the charter. The *minor* has been considered. But the conclusion does not follow from the premises. The temporal and spiritual concerns of the congregation are different things. The corporation supports the temporalities of the church. *St. Mary's Church*, 7 *Serg. & Rawle* 549. The title to the property of the congregation, if in the trustees at all, remains there, unaffected by any change in its spiritual relations. If the trustees misapply the property, they may be compelled to perform their duty, or be removed. Ejectment is not the proper remedy. *Meth. Ch.* v. *Remington*, 1 *Watts* 218; *Comm.* v. *Murray*, 11 *Serg. & Rawle* 74, 75. Nothing like a misapplication of the property could be shown here. The church is open to all, the plaintiffs included, and their claim to exclusive possession is founded on party shibboleths which this court cannot understand or distinguish. A chancellor would not interfere. *Baptist Ch.* v. *Wetherell*, 2 *Paige* 296; *Lawyer* v. *Cipperly*, 7 *Paige* 281. It is not the gross case where equity has interposed. *Attorney General* v. *Pearson*, 3 *Meriv.* 353.

The minority separated voluntarily, for nothing was done forbidden by the deed or charter, and to which they could not be asked to submit. The congregation, as far as temporalities are concerned, is a mere corporation; and the majority have the right to keep up the succession. The minority could not separate, and elect trustees to represent the corporation in opposition to those elected by a majority of the corporators. By forming a new society, exclusive of the other members of the congregation, they ceased to be identified with the latter, and lost their rights under

the deed and charter. Nothing occurred to justify the exclusion of the contribūtors of 1838 from participating in the election of 1839, and the plaintiffs' election, without notice to them, is invalid.

Both conclusions, therefore, of the plaintiffs, fail. The authorities, cited by them from the New England states, do not apply. So those cited to support the right of a *cestui que trust*, to maintain ejectment.

The opinion of the Court was delivered by

GIBSON, C. J.—This ejectment is brought in the name of the corporation by a minority of the congregation, who, having withdrawn from its stated worship in the church building, insist that the majority have forfeited their corporate rights by dissolving the connexion of the congregation with the Presbytery of Carlisle, and the primitive General Assembly; and to understand the grounds on which they have placed the controversy, it is necessary to state the case with its circumstances.

The congregation was formed in 1762; for it was proved at the trial that ministerial supplies were furnished in that year by the Presbytery of Donegal, and subsequently by the Presbytery of Carlisle, under whose care it remained till the late convulsion of the Presbyterian body induced it, while disclaiming all intention to become an independent church, to decline for the present the jurisdiction of the conflicting judicatories. Its pulpit seems not to have been regularly filled till the installation of the Reverend Doctor Cathcart in 1793. Such were its origin and ecclesiastical relations. The property in contest was conveyed by John Penn, Sen. and John Penn, Jun., late proprietaries of the province of Pennsylvania, to George Irwin, William Scott, and Archibald M'Lean, "in trust for, and as a site for a house of *religious worship*, and a burial place for the use of the said religious society of English Presbyterians and their successors, in and near the said town of York in the county of York; and in confidence that they, the said George Irwin, William Scott, and Archibald M'Lean, and the survivor of them, their and his heirs and assigns, shall and will permit and suffer the said lot or piece of ground and premises and the buildings thereon hereafter to be erected, to be from time to time, and at all times hereafter, at the disposal and under the care, regulation, and management of the said religious society and their successors in and near the town of York aforesaid; and to and for no other use, intent, or purpose whatsoever." The church seems to have been built shortly afterwards, but it was not finished before the installation of Doctor Cathcart. The congregation obtained a patent of incorporation in 1813, by the style of "The Trustees of the English *Presbyterian* Congregation in the borough of York;" but the legal title of the original trustees has not been conveyed to it, and the corporation is now, what the congregation were before, the party beneficially entitled. It will be perceived

therefore that the minority attempt to use the corporate name in order to oust the majority for an alleged forfeiture of their corporate rights, incurred, as it is supposed, by an application of the property to uses differing from those which the founders prescribed.

By the common law he who gives the first possessions to a corporation is the founder of it, and entitled to the rights which the foundership gives. *Viner's Abr. Tit. Corporations H.* 1. These consist in visitation, and correction of any misapplication of his bounty to purposes foreign to its original destination. What then was the purpose prescribed by the Messrs. Penn? It was no more than to carry out the generous policy of their ancestor, the founder of the province, who, though rigidly attached to the principles of the society of Friends, was bigoted to no particular sect; but munificent to all; and who left each to apply his gifts to such pious uses as it might think fit. That his descendants followed his example in this instance, is shown by the terms of the trust, which prescribed no form of doctrine or discipline, the beneficiary being described as the English Presbyterian Congregation, evidently to individuate it; and that subjection to a particular assembly, was not a condition of the grant, is proved by the fact that there was at that time no such assembly in America. The conveyance was executed in 1785; and the General Assembly of the American Presbyterian Church was constituted by the synod of New York and Philadelphia in 1788. It may be said that this congregation was connected with the elements of which the General Assembly was formed, and that it is bound to conform to those subsequent changes to which its representatives in the synod assented. But were the founders, or the subject of their bounty bound by terms to which the founders did not originally assent? The original terms could not be altered even with their own consent; for that they are as incompetent as any one else to add to, or take away from them, was ruled in Philips *v.* Bury, *Skin.* 513, in which it was agreed that the founder having given statutes to a college, can not alter them unless he has reserved a right to do so. As tests of sectarian denomination and character, therefore, the divisions that have since taken place about the constitution of the General Assembly must be laid out of the case. The founders foresaw them not; and had they foreseen them, they would have left them to be dealt with by the congregation at its pleasure. The members of the congregation who erected the building may be thought to have had a separate interest of their own in the purpose to which it was to be dedicated; but even they cannot be said to have erected it with a view to a particular union, for though it was not finished till after the assembly was constituted, it was begun, and the pecuniary responsibilities incident to the plan were contracted previously. But by the common law, even subsequent contributors have no other right of

direction than that which the founder has prescribed; for they come in and give their money on a basis already established, and they can neither add to it nor take any thing from it.   If then the Messrs. Penn necessarily gave the ground in contest, subject to the direction of a majority bearing the name of Presbyterians, subsequent contributors with particular views, could not change the destination of it.   But though no standard of discipline or faith be prescribed in the conveyance or charter of incorporation, I entirely concur in what Lord Eldon said in the *Attorney General* v. *Pearson*, 3 *Meriv. Rep.* 353, that " when a house is created for religious worship, and it cannot be discovered what was the nature of the worship intended by it, it must be implied from the usage of the congregation; and that it is the duty of the court to administer the trust in such a manner as best to establish the usage, considering it as a matter of implied contract with the congregation."   I understand by this, that contemporaneous usage is evidence of an implied contract betwixt the founder and the congregation, and consequently of the purpose intended by him; but when, as here, neither the usage nor the purpose could possibly have existed at the time material to the question, subsequent usage cannot add to that which he intended.   I agree with him also, " that when the members of a congregation become dissentient among themselves, it is not in the power of individuals to say, we have changed our opinions, and you who assemble in this place for the purpose of hearing the *doctrines* and joining in the *worship* prescribed by the founder, shall no longer enjoy the benefit he intended for you unless you conform to the alterations which have taken place in our opinions."   With all this and much more, I promptly agree when predicated of a congregation adhering as nearly as it can to the principles of its original faith, and not, as in that case, swerving from the tenets of trinitarianism and embracing the hostile tenets of unitarianism.   I concede also that subjection to a particular judicatory may be made a fundamental condition of a grant, as it expressly was in *Duncan* v. *The Ninth Presbyterian Congregation*, in which the trust was declared to be for " such congregation of persons as shall belong to the present reformed synod to which the Reverend Robert Annan's church in Spruce street belongs"—a case which was ultimately settled by the parties, but in which I differed from some of my brethren who thought the congregation had not lost its property in the trust by putting off its distinctive character and merging itself in the mass of the Presbyterian church.   That was a strong case; but it is altogether unlike the present, in which no such condition was expressed or implied.   Even without an express condition, it might be a breach of the compact of association for the majority of a congregation to go over to a sect of a different denomination, though it were different only in name.   For instance, the majority of a congregation of seceders could not carry the church property

into the Presbyterian connexion, though these two sects have the same standards and plan of government. But this principle is inapplicable to a change of connexion as regards different parts of the same denomination or sect.

Now, since the foundation of this congregation, an event has happened which the founders did not contemplate, and which would not have been provided for, had it been foreseen. This was no less than a dismemberment of the Presbyterian body, not indeed by disorganization of it, or an entire reduction of it to its primitive elements, but by an excision, constitutional though it was, of whole synods with their presbyteries and congregations. There was not merely a secession of particles, leaving the original mass entire, but the original mass was split into two fragments of nearly equal magnitude; and though it was held by this court, in the *Commonwealth* v. *Green,* *Whart. Rep.* 531, that the party which happened to be in office by means of its numerical superiority at the time of the division, was that which was entitled to represent it, and perform the functions of the original body, it was not because the minority were thought to be any thing else than Presbyterians, but because a popular body is known only by its government or head. That they differed from the majority in doctrine or discipline, was not pretended, though it was alleged that they did not maintain the scriptural warrant of ruling elders. But the difference in this respect had been tolerated if not sanctioned by the Assembly itself, which, with full knowledge of it, had allowed the heterodox synods to grow up as part of the church; and it could not, therefore, have been viewed as radical or essential. We were called on, however, to pass, not on a question of heresy, for we would have been incompetent to decide it, but on the regularity of the meeting at which the trustees were chosen. I mention this to show that we did not determine that the excision was expurgation and not division. Indeed, the measure would seem to have been as decisively revolutionary, as would be an exclusion of particular states from the federal union for the adoption of an anti-republican form of government. The excluded synods, gathering to themselves the disaffected in other quarters of the church, formed themselves into a distinct body, governed by a supreme judicatory, so like its fellow as to pass for its twin brother, and even to lay claim to the succession. That the old school party succeeded to the privileges and property of the Assembly, was not because it was more Presbyterian than the other, but because it was stronger; for had it been the weaker, it would have been the party excluded, and the new school party, exercising the government as it then had done, would have succeeded in its stead, and thus the doctrine pressed upon us, would have made title to church property the sport of accident. In that event, an attempt to deprive the old school congregations of their churches, for an act of the majority, in

withdrawing from the jurisdiction of the assembly, would have loaded the new school party with such a weight of popular odium as would have sunk it. Here then was the original mass divided into two parts of nearly equal magnitude and similar structure; and what was a congregation in the predicament of the one before us to do? It surely was not bound to follow the party which was successful in the conflict, merely because superiority of numbers had given it the victory.

Before the American revolution, the church of England in America, as it was called, was annexed to the diocess of the Bishop of London; and it will scarce be pretended that, after its separation from it as a natural, but not inevitable consequence of our political independence, a single American parishioner might have recovered the church with its parsonage and glebe, when there was any, from his dissentient brethren, by insisting on a continuance of the ancient connexion. Public opinion would not have borne it. Yet every Episcopal congregation in America had been founded on the basis of that connexion, and our independence in other matters had raised no unanswerable objection to its permanence, especially, after the Bishop of London had procured an act of Parliament to dispense with engagements by the American Episcopal clergy that would have interfered with their political allegiance. It is true that the separation was effected with the assent of the mother church; but it was the parishioner here, and not the church abroad, whose consent was necessary to a dissolution of his ecclesiastical relation, in order to impair his civil rights. Besides, the consent of the mother church was only formal, and given to the separation as to a measure which she could not prevent. She indeed conferred the episcopate, and thus secured a continuance of the apostolic succession to the American Episcopal church; but that might have been had from the nonjuring bishops in Scotland, as it was by Doctor Seabury, or from the Danish Episcopal church, which indeed offered it on terms of signing the thirty-nine articles of the church of England, with the exception of their political parts. Had the offer been accepted, there would have been an adverse withdrawal of ecclesiastical allegiance — in principle the very case before us — and it will not be pretended that the majority of an Episcopal congregation here would not have been at liberty, in that event, to form a connexion with an independent Episcopal church government, without forfeiting the interest of each in the church property.

The revolution led to no severance of the Presbyterian church in America from the church of Scotland, for there had been neither connexion nor correspondence between them, and no illustration of the principle proposed, can be had from that quarter; but might not one of these very congregations which were severed from the primitive General Assembly here, have formed a new con-

nexion when driven from the old one, without forfeiting its interest in the church property? or could a strictly orthodox minority strip them of it by organizing themselves as a congregation, on strictly Presbyterian principles, and regaining the former connexion? To cut off the dissenters in the first instance, and to confiscate their property for what was declared to be a heresy for the first time, would be an act of power, not of justice. It will not be denied that they were Presbyterian in doctrine and discipline, or that if they were not, they had been received as such into the bosom of the church; and what is the difference betwixt such a congregation and the one before us? It is, that the one was turned out of the connexion, and that the other withdrew from it voluntarily; but the minority of the one has as much right as the minority of the other to seize the church property for a violation of conditions supposed to be implied by the act of association. It will not do to say the Assembly sanctioned the separation in the one case and not in the other; for the Assembly had no power over the civil rights of the parties, and could not impair them. Nor did it mean to impair them. On the contrary, it allowed what it considered to be the sound parts of those congregations to attach themselves to the nearest orthodox presbytery. This was done, most assuredly, not to enable them to despoil their congregational brethren; but had they attempted to do so, it is hazarding little to say they would have been disappointed.

In a case like the present, it may be demanded, to what is the minority of a dissentient congregation to appeal? It might be replied, that for the contingency of revolution, it made no provision in its articles of association, and the law makes none; but that to the justice and forbearance of the majority of the association, whose very object is to deal justly, love mercy, and walk humbly, it is to be supposed that the minority cannot appeal in vain. Nor has such an appeal in any instance been unsuccessful. The schism which a few years since shook the Methodist church to its centre, is heard of no more; and perhaps this happy termination of it has been effected in a great measure by the good sense of the parties in following the advice of this court in the *Methodist Church* v. *Remington*, 1 *Watts* 227, " to part in peace, having settled their claims to the property on the basis of mutual and liberal concession." And the same thing has been done with like effect by the original Presbyterian congregation in Carlisle.

In conclusion, we are of opinion that no particular Presbyterian connexion was prescribed by the founders, or established by the charter; and that if such connexion had been prescribed, there has been no adhesion to a connexion essentially different, and that the breaking up of the original Presbyterian confederation, has released this congregation from the duty of adhering to any particular part of it in exclusion of another. Instead of examining each specific error, it has been thought better to examine

the principles on which the title depends; and though the jury were inaccurately instructed that an action could not be maintained by the corporation on its equitable title, yet as other principles in the cause are decisive against its right to recover, the record is free from any error which could do the party an injury.

KENNEDY, J., *dissenting.*—This is an action of ejectment for a lot of ground, situate in the borough of York, containing about two acres, with a brick church, a two-story dwelling-house, and a frame stable thereon. The plaintiffs claim to be incorporated under a charter certified by the governor of this commonwealth, on the 7th of December 1813; and, as such incorporation, they also allege that they are entitled to the possession of the property in question. In support of their claim, after giving the charter of incorporation in evidence, they read in evidence a deed of bargain and sale, bearing date the 29th of September 1785, from John Penn, Jun. and John Penn, Esquires, late proprietaries of Pennsylvania, to George Irwin, merchant, William Scott, and Archibald M'Lean, Esquires, conveying to them, their heirs and assigns, the said lot of ground, in consideration as well of the inclination of the bargainors to comply with a request made of them by the bargainees on behalf of themselves and other members of the religious society of the English Presbyterians in and near the town of York, in York county, and the commonwealth of Pennsylvania, to grant to the said society, in fee, the said lot of ground, as a site for a house of religious worship, and a burial place for the use of the said religious society of the said English Presbyterians and their successors, in and near the said town of York, as the sum of five shillings, lawful money of Pennsylvania, to the bargainors in hand paid by the bargainees, to have and to hold the said lot of ground, with its appurtenances, unto the said George Irwin, William Scott, and Archibald M'Lean, their heirs and assigns, for ever, in trust for the use of the said religious society of English Presbyterians, and their successors, in and near the said town of York, in the county of York; and in confidence that they, the said George Irwin, William Scott, and Archibald M'Lean, and the survivor of them, their and his heirs and assigns, shall and will permit and suffer the said lot of ground, and the buildings thereon, thereafter to be erected, to be from time to time, and at all times thereafter for ever, at the disposal, and under the care, regulation, and management of the said religious society and their successors, in and near the town of York aforesaid; and to and for no other use, intent, or purpose whatsoever.

Other evidence was also given, showing that previously to the 16th of October 1838, the plaintiffs and defendants individually were members of the religious society of English Presbyterians, in and near the town of York; and at that time, and for many years previously, even prior to the date of the deed aforesaid from

the Penns, *at least* as early as 1765, were, and had, as a congregation, formed a constituent part of the Carlisle Presbytery, and consequently were, and had been under its immediate care and direction. That a meeting of the congregation took place on the said 16th of October 1838, in consequence of a communication from the Presbytery of Carlisle, reciting that the congregation had applied, by a commissioner, appointed for that purpose, to the Presbytery for leave to present a call to the Rev. B. J. Wallace, a member of the Presbytery of Muhlenburg (Kentucky); which application had never been made, although Mr. Wallace had been statedly preaching to said congregation for the last eight months, without having presented himself or his credentials to the Presbytery, or to the committee of the Presbytery appointed to examine the credentials of travelling ministers; and that there was reason to apprehend that the congregation would receive injury by such a state of things continuing; and therefore, resolving, that, in the judgment of the Presbytery, Mr Wallace had been acting in an irregular manner; that the stated clerk write to the Presbytery of Muhlenburg, and inform them of Mr Wallace's conduct, and the opinion of the Carlisle Presbytery respecting it; and that a copy of the foregoing be sent by the stated clerk to Mr Wallace and the session of the congregation of York. At the meeting of the congregation held in consequence of this communication, on the 16th of October 1838, a resolution was offered and seconded, stating that the congregation, having been, for nearly the whole period of its organization, in connexion with the Carlisle Presbytery, ought not to be separated from it. This resolution, after being debated, was postponed by a majority of the persons present, and a substitute adopted declaring, " that the church and congregation continue to recognise the Confession of Faith of the Presbyterian Church of the United States of America, as containing the system of doctrine taught in the Holy Scriptures, and approve of the government of the same church on the basis of the constitution. That in studying the peace and unity of that church (congregation), and in the peculiar circumstances in which it was placed, while they disclaimed any intention of becoming an independent church, they deemed it inexpedient for the present, to recognise the jurisdiction of any of the conflicting church judicatories, which may claim authority over them." The resolution, thus adopted by the majority, being looked upon by the minority as an avowed determination to separate the church or congregation from the Carlisle Presbytery, offered a protest, which they requested to have entered upon the minutes of the meeting. But this was refused by the majority, who still proceeded further, and passed a resolution declaring " that that church and congregation cheerfully exonerated the Rev. B. J. Wallace from any charge of neglect, on his part, in not having earlier obtained his certificate of dismissal from the Presbytery

of Muhlenburg, Kentucky, as they believed him to have used all proper means to obtain the same." And furthermore, " that that church and congregation highly approved of the ministerial labours and conduct of the Rev. B. J. Wallace since he had been among them, and believed that his talents and piety highly qualified him to promote the spiritual interests of that congregation." And lastly, " that although they did not desire, for the present, that any change should take place in the ecclesiastical relations of their minister, the Rev. B. J. Wallace, yet they were willing, should circumstances render it absolutely necessary, that he should seek such connexions as would afford him requisite ecclesiastical protection." That from this time the congregation became divided into two parts. The one part being the minority, who were for adhering to their connexion with the Carlisle Presbytery, are the plaintiffs in this action; and the majority, who retained and still continue to retain the possession of the lot of ground, together with the buildings thereon, including the meeting-house, and the Rev. B. J. Wallace as their preacher. That afterwards, on the 9th of November 1838, when a committee from the Presbytery of Carlisle, appointed shortly before at a meeting of the same held at Lancaster city, to visit the English Presbyterian church in York, and to confer with the officers and members of said church, came and announced their presence for that purpose, instead of being received and admitted to a conference by the party in possession of the church-house, the defendants, they were presented with a copy of their resolutions, passed on the 16th of October preceding, the purport of which is stated above; and to a request, made by the said committee, to be admitted into the church-house, a positive denial was given. That afterwards, in 1839, the majority, without consulting the Carlisle Presbytery, united themselves with a Presbytery called the Presbytery of Harrisburg, which was established some short time previously by what is generally called and known by the name of " the General Assembly of the New School Presbyterians in the United States of America" consisting in part of a secession from " the General Assembly of the Presbyterian Church in the United States of America." That this same majority, claiming to be " the congregation of the English Presbyterian church in the borough of York, in the county of York, and state of Pennsylvania;" after their union with the New School Presbyterians, on the first Monday of May, in the succeeding year 1839, elected the defendants as trustees under the 9th Article of the charter read in evidence. While the minority, still continuing their connexion with the Carlisle Presbytery and the General Assembly of the Presbyterian Church in the United States of America, claiming in like manner to be the congregation of the English Presbyterian church in the borough of York, &c., also elected trustees in conformity to the said article.

[Presbyterian Congregation v. Johnston.]

These would seem to be the undisputed facts of the case; out of which two questions have been raised. First: Are the minority to be regarded as " the Religious Society of the English Presbyterians in and near the town of York, in the county of York and state of Pennsylvania, mentioned in the deed from the Penns, and as being the same who were incorporated by the charter given in evidence? And secondly, admitting the said minority to be the same, and the trustees elected by them to be the congregation that is embraced and incorporated by the charter given in evidence, have they, as an incorporation, such a right to the possession of the property in dispute as will entitle them to recover it in this action?

In regard to the first question, it is proper to premise that it is not denied, but admitted by both parties, that the religious society of English Presbyterians in and near the town of York, &c., mentioned in the deed of the Penns, as the society for whose use the lot in question was thereby conveyed to the trustees therein named, is the same religious society which was subsequently incorporated, in the year 1813, by the name, style, and title of " the trustees of the English Presbyterian congregation in the borough of York." And, indeed, if it be that the words " in and near the town of York," describe the same topographical limits as those of " the borough of York," the description of the society as given in the deed would seem to be substantially the same with that contained in the charter of incorporation; for either is clearly sufficient to show that the society intended to be made the object of the bounty of the Penns, was a *Presbyterian* church or congregation, composed of persons, as members thereof, speaking and using the English language exclusively in their religious worship and exercises, and residing at the time of making the deed, " in and near the town of York," &c., the town not then being a borough, but afterwards, when it came to be incorporated as such, residing within the limits of the borough, which, as may be fairly inferred, were extended so as to embrace the town and its vicinity, or the land and the inhabitants upon it, in and near the town.

Now, in the exposition of deeds, as also in all other instruments of writing containing the contracts of parties, the intention of the parties, if lawful, must be regarded and carried into effect; and it is the bounden duty of courts, when appealed to, to cause this to be done to the utmost extent of their powers.

The object and design of a trust created by deed, as in this case, must therefore be particularly attended to; and where the object and design of the trust are plainly indicated by the terms of the deed, courts are bound, when properly called on for that purpose, to give effect to the trust according to such design. And even where the object of the trust is not plainly pointed out and specified upon the face of the deed, so as to discover therefrom what form or species of religious worship was intended, the usage

of the congregation in that respect will be inquired into and resorted to by the court as a directory in the administration of the trust. Accordingly, Lord Eldon, in the case of The *Attorney General* v. *Pearson,* 3 *Meriv.* 400, lays it down, that when an institution exists for the purpose of religious worship, and it cannot be discovered from the deed declaring the trust, what form or species of religious worship was intended, the court can find no other means of deciding the question than through the medium of an inquiry into what has been the usage of the congregation in respect to it; and if the usage turns out upon inquiry to be such as can be supported, it is the duty of the court to administer the trust in such a manner as to establish the usage, considering it as a matter of implied contract between the members of that congregation. But if on the other hand, it turns out that the institution was established for the express purpose of such form of religious worship, or the teaching of such particular doctrines as the founder has thought most conformable to the principles of the Christian religion, he considered that it was not in the power of individuals having the management of that institution, at any time, to alter the purpose for which it was founded, or to say to the remaining members, " we have changed our opinions, and you who assemble in this place for the purpose of hearing the doctrines and joining in the worship prescribed by the founder, shall no longer enjoy the benefit he intended for you, unless you conform to the alteration which has taken place in our opinion." In such a case, therefore, considering it as settled by the House of Lords in a case mentioned by him, upon an appeal from Scotland, he apprehends, that when a congregation become dissatisfied among themselves, the *nature of the original institution* must alone be looked to as the *guide for the decision of the court,* and that to refer to any other criterion, such as the *sense of the existing majority,* would be to make a new institution, which is altogether beyond the reach, and inconsistent with the duties and character of the court.

Again, this eminent chancellor, distinguished alike for his great depth of learning and soundness of judgment, both in legal and equitable matters, in the same case, page 409 of the same book, observes, " If land or money be given for the purpose of building a church or a house, or otherwise maintaining the worship of God, and if there be nothing more precise in the case, this court would execute such a trust by making it a provision for maintaining and propagating the established religion of the country. But it is clearly settled, that if a fund, real or personal, be given in such a way that the purpose be clearly expressed to be that of maintaining a society of Protestant dissenters, promoting no doctrines contrary to law, it is the duty of the court to carry such a trust as that into execution, and to administer it according to the intent of the founder." If this be the rule by which courts are governed in England, in cases where the form and nature of the religious

worship, to be promoted by the trust, is clearly expressed, it would seem to be much more applicable and just here, where we have no favourite church established by law to claim, or to which a preference can be given. And further, in page 418 of the same book, this learned chancellor declares that "If any persons seeking the benefit of a trust for charitable purposes, should incline to the adoption of a different system from that which was intended by the original founders or donors; and if others of those who are interested think proper to adhere to the original system, the *leaning of the court* must be to *support those adhering to the original system*, and *not* to *sacrifice the original system* to any *change of sentiment* in the persons seeking alteration, however *commendable* that proposed alteration may be." From this doctrine, which seems to be founded upon the great cardinal rule obtaining in the exposition of deeds, and indeed of all contracts, that a trust created or declared must be carried into effect and administered according to the intent of the donor, or of the parties thereto, if lawful, as nearly as practicable, it is clear, that not only the religious principles of the society intended to be benefited by the deed, but likewise the form of worship, as also that of the church government with which the society stands connected at the time of the gift, are all to be looked to and regarded by the court, when called on to administer the trust and settle the rights of the contending parties, lest the intention of the donor may by possibility be defeated, or some portion of the *cestuis que trust* deprived of the benefit and right intended to be secured to them under the grant. And should any portion of the congregation, whether it consist of a majority or a minority, desire a change in all or any of these particulars, it is not in the power of the court either to grant or sanction it. On the contrary, it is the imperious duty of the court to determine against every thing of the sort; and to decide in favour of those, whether a minority or a majority of the congregation, who are for adhering to the doctrine professed by the congregation, and the form of worship in practice, as also the form of the government of the church in operation, with which it was connected at the time the trust was first declared. Then, for what purpose, and for whose use, does the lot of ground in question appear to have been granted by the Penns? It is expressly declared in the deed to be "as a site for a house of religious worship, and a burial-place for the use of the religious society of the English Presbyterians and their successors, in and near the town of York in the county of York."

Thus it appears from the face of the deed itself, that the *cestui que trusts* were a Presbyterian church or congregation, located in and near the town of York in the county of York, which worshipped and performed their religious exercises in the English language; and that they were to have the lot for the purpose of erecting thereon, for their own use, a house of religious worship,

and as a place for the burial of their dead. But this society could not be an English *Presbyterian* church or congregation, as it is denominated in the deed, without being connected with some Presbytery then *in esse* under the government of the Presbyterian church within the United States of America. This would seem to be requisite from the very definition of a particular church, as given in the Confession of Faith, containing the constitution of the Presbyterian Church in the United States of America, *Tit. Form of Government, ch.* 2, *sec.* 4. There it is said, " a particular church consists of a number of professing Christians, with their offspring, voluntarily associated together for divine worship and godly living, agreeably to the holy scriptures; and *submitting to a certain form of government.*" At the time of the gift of the lot in question by the Penns, the religious society of English Presbyterians in and near the town of York, was joined with and under the care and direction of the Presbytery of Carlisle; and, according to the form of the Presbyterian church government, may be said to have formed a constituent part thereof; and, as it would appear from the evidence, had been under the care and direction of that Presbytery from 1765, some twenty years prior to the date of the gift: and being without any stated pastor during that period, had received supplies, as it is usually termed, from that Presbytery. It would also appear from the evidence, that this society or congregation afterwards, in the year 1793, by the permission and authority of the Carlisle Presbytery, received the Rev. Mr Cathcart as their stated pastor. That he continued under the care and jurisdiction of this Presbytery as long as he remained *their pastor; and that they remained under its care and jurisdiction* until the 16th of October 1838, when the defendants and those whom they represent, forming a part of the congregation at that time, resolved, in effect, that they would no longer recognize the authority or jurisdiction of the Carlisle Presbytery; nor indeed that of any other Presbytery; for they say that they " deem it inexpedient for the present to recognise the jurisdiction of any of the conflicting church judicatories which may claim authority over them;" and shortly afterwards, on the 9th of November following, they, being in the possession of the church-house erected on the lot in question, acted in accordance with this resolution by closing its doors against a committee appointed by the same Presbytery to visit and confer with them; and absolutely refused to have any communion or conference with the committee. And further, in defiance of the previous admonition received from that Presbytery, continued to retain Mr Wallace as their preacher. And although it be true, that they, at the same time that they renounced their obedience and subjection to any church judicatory that should claim the same of them, declared that they " continued to recognise the Confession of Faith of the Presbyterian Church of the United States of America, as contain-

ing the system of doctrine taught in the holy scriptures, and approved of the government of the same church on the basis of the constitution;" yet surely no intelligent man would suppose that such a declaration or salvo, as this, could have the effect of either preserving their membership in the congregation or their standing in the Presbyterian Church of the United States of America. Their resolution, solemnly taken and subsequently acted upon, amounted clearly to a withdrawal and secession, at least for the time being, from the Presbyterian church, notwithstanding their reservation to the contrary. But it is said that their resolution, in this respect, was, at most, as it were, a mere declaration of intention, on their part, to be and remain neutral, until the civil war, which had broken out, and was then raging in the Presbyterian church should be settled and finally ended; and that they afterwards united themselves with a Presbytery, called the Presbytery of Harrisburg, which was organized by the New School General Assembly. But it must be admitted, that for a certain time at least, they had placed themselves entirely without the government of the church, and were wholly unwilling to submit to it. For notwithstanding their religious faith may have continued the same that it was before, yet the instant they refused to submit to the government and discipline of the Presbyterian church, to which they had been united, they ceased to be members of that church. "To constitute a member of any church," says Chief Justice Ewing, in *Den* v. *Bolton et al.,* 7 *Halst. Rep.* 214, "two points at least are essential, without meaning to say that others are not so, a profession of its faith and a submission to its government." And such in effect is the language and spirit of the book entitled "The Confession of Faith," which contains a summary of the doctrines taught in the Presbyterian church, together with a directory for the worship of God, and a plan of its government and discipline. Indeed it is perfectly obvious that government and submission are as necessary to the spiritual welfare and happiness of the members of the church, as civil government, and submission to it, is for the secure enjoyment of all the rights appertaining to our persons, as also those which we have to things. And, seeing the church cannot compel obedience to its laws and mandates, otherwise than by the exertion of a moral force merely, it is perfectly just and reasonable that those who renounce the church, or refuse to yield obedience to her regulations and authority, should thereby forfeit and lose all right to membership. If this were not so, it would answer little or no purpose, that the Presbytery, for instance, in the Presbyterian church is vested with a power, among other things, " to visit particular churches under its care, for the purpose of inquiring into their state and redressing the evils that may have arisen in them; to unite or divide congregations, at the request of the people, or to form or receive new congregations, and in general to *order*

[Presbyterian Congregation v. Johnston.]

*whatever pertains to the spiritual welfare of the churches under its care."* See Confession of Faith, *tit. Form of Government, ch.* 10, *sec.* 8. Hence it is, because members of the Reformed Dutch Church in the United States are not subject to the government of the Presbyterian church, that they are not considered members of the latter church; and for the same reason, Presbyterians are not considered members of the Reformed Dutch Church, although their faith is the same. This course of reasoning, which I take to be correct, goes to show that the defendants, notwithstanding they may have continued to hold the same religious faith and tenets that they did before their withdrawal from their former connexion with the government of the Presbyterian church, yet ceased to be members of it, and likewise of the congregation, of which they theretofore had formed a part up to that time; and having ceased to be members of the congregation, the necessary consequence would seem to be, that they also ceased to have any valid claim or interest in the lot in question, as long as any portion of the congregation remained to enjoy it under the government of the Presbyterian church in the same manner as at the time the lot was granted by the Penns, and ever afterwards — unless, indeed, it be that their having become united afterwards with the Presbytery of Harrisburg, as already mentioned, preserved their right in the lot, as being the congregation for whose use and benefit it was granted. Individually and personally they can have no claim, because it is not probable that any one of them was a member of the congregation at the date of the gift; possibly not even born then. But supposing the contrary to be the fact, still if it has not been shown already, it will be, that the only interest which they acquired under the deed of gift was limited in its duration to the time of their continuing to be members of the congregation. It is therefore only by reason of the defendants either being or having become members of the same congregation and continuing to be such, that they can pretend to have a claim to the property in question.

It appears on the face of the deed from the Penns, that the society or congregation for whose use the lot was given, was a Presbyterian congregation; and further, from the evidence given on the trial of the cause, it appears that at the date of the deed, and for twenty years previously, they had been under the care and jurisdiction of the Presbytery of Carlisle, one of the judicatories of the only Presbyterian Church known during that period in the United States of America; so that if the congregation was not sufficiently designated in the deed of gift, so as to disclose clearly the object and design of their primitive formation, it was made manifest from the evidence by a usage of upwards of twenty years, that it was formed for the purpose of worshipping God according to the Presbyterian Directory, under the protection and

I. — 7        E

[Presbyterian Congregation v. Johnston.]

aid of the government of that church, and that alone, as it would seem. Now, if the defendants, after their first declaration of neutrality, *flagrante bello*, had submitted themselves again to the authority of the Presbytery of Carlisle, or the Synod or General Assembly to which it belonged, they would doubtless be entitled to be considered still as part of the same congregation; and if it be that they are really the majority, and had no other object in view than the worship of God under a full conviction of the Presbyterian faith, according to its directory, it is most likely that they would thus have attained it. This, however, they did not choose to do, but elected to join the Presbytery of Harrisburg, a judicatory, though Presbyterian, that has no connexion whatever with the church and government under which the congregation existed, either at the time of the gift, or of the withdrawal by the defendants therefrom. It is a Presbytery organized by a secession from the Presbyterian Church of the United States of America, styling themselves, however, " The General Assembly of the Presbyterian Church of the United States of America," and claiming not only to be that body, but likewise all the rights belonging to it. But they have been held by this court in *The Commonwealth* v. *Green et al.*, 4 *Whart. Rep.* 531, not to be the same, nor entitled to the rights appertaining to the same. By the decision in that case, this New School Assembly, as they are pretty generally denominated, were held not to be the General Assembly of the Presbyterian Church of the United States of America, that had existed from 1788, but a secession merely from it, that could not be considered the same in any respect whatever. It is said, however, that this decision was founded upon the fact and the principle that they were a minority of the Presbyterian body. This, I think, is a misapprehension, for I cannot discover any such ground taken in the opinion of the court as reported; and for myself, I must say that it did not receive my concurrence upon any such ground; but upon the principle that it was an assembly which had organized itself in direct violation, as it appeared to me, of the established rules and government of the Presbyterian Church. They, in short, by organizing themselves as they did, thereby refused to submit to the government of that church, and thus, as it were, disfranchised themselves; and by their association became a new and entirely distinct body or assembly from that of the General Assembly of the Presbyterian Church in the United States of America. This being the case, it was of no importance whether they were the minority or the majority, because it was not competent for the one more than the other to take the rule of the church into their own hands in a manner different from that prescribed by its government.

Then, seeing the defendants here, and those whom they represent, were but a part of the congregation under the government of the Presbyterian Church anterior to the 16th of October 1838,

and that they have united themselves with those who seceded from that church, while the plaintiffs, the residue of the congregation, remained and continued to do so under its government, how can the former be said to be the congregation for whose use the gift in question was intended? They have undoubtedly changed their position entirely in regard to the church to which they were attached, and by which they were governed at the time the gift was made; while the plaintiffs, on the other hand, continue to maintain the same relation and connexion with the Presbyterian Church that the entire congregation had at the date of the gift, and ever afterwards, until the secession of the defendants. But, it is said that the General Assembly of the Presbyterian Church of the United States of America was not in being at the date of the gift, and therefore the withdrawal from its government could not possibly change the nature and character of the congregation, or its rights as such; and that the defendants, being the majority, must therefore still be considered the congregation entitled to the use of the property in question. But this argument, if indeed it can be called one, is very small, if not perfectly futile. Presbyterianism, like man himself, had its state of infancy in the United States, and continued to increase in size and strength with the increase of years until it might be said to have attained something like its majority. The first Presbyterian church in the United States consisted of a single congregation, formed in the city of Philadelphia, about the year 1700, which is known now by the name of the First Presbyterian Church in that city. Increasing, however, in number and strength, several congregations were formed shortly afterwards. In 1704 the first Presbytery was organized; and in 1716 the first Synod, consisting of four Presbyteries. It was called the Synod of Philadelphia; but in 1741 a division took place, which gave rise to a second, called the Synod of New York. In 1758, however, these Synods became united again under the title of the Synod of New York and Philadelphia, and governed the Presbyterian church in the United States until 1788, when the Presbyterians having increased greatly in number, and being dispersed over a great extent of territory, it was deemed expedient, in order to promote and preserve purity, and prevent error from creeping into the church, to increase the number of synods, and to establish a General Assembly, in imitation of that established by the Church of Scotland under the Westminster Confession of Faith, invested with executive, legislative and judicial power over the whole church. The form of government adopted by the Church of Scotland, and given in the Westminster Confession of Faith, was ever looked to by the Presbyterians in the United States as their guide, and was followed and adopted by them, with the exception as to the power given to the civil magistrate in matters of religion, from time to time, as their numbers increased and rendered it expedient, if not necessary, to do

so.   They began first by forming themselves into a single con-
gregation; next into a presbytery, as soon as the requisite number
of congregations were formed to compose it.   Then, as the num-
ber of presbyteries was increased, a synod was organized; after
that several particular synods, and ultimately the General Assem-
bly, or what, in other words, may be called the National Synod.
But certainly it never entered into the mind of any one to con-
ceive that the creation of a Presbyterian Synod or General Assem-
bly changed the nature or affected the identity of any of the
congregations or particular churches composing the elements of
such Synod or General Assembly, more than the growth of a child
into manhood would affect the identity of his person.   The plain-
tiffs, therefore, stand precisely in the same position in the Pres-
byterian Church, and maintain the same relation to it, that
their predecessors did at the time the property in question
was granted to their use.   Seeing, then, that they still hold to
the same religious faith and doctrines, and are in perfect subjec-
tion to the government of the same church, why are they not to
be considered the society for whose use and benefit the gift was
made and intended?   Not only the language of the deed of the
Penns, but the practice and usage of the society for more than
twenty years before the making of the deed, show clearly that
the purpose for which the plaintiffs demand the property in this
action, is the same that it was intended it should for ever be
applied to by the donors, the donees, and all concerned.   The
liberality of the Penns has been spoken of, in their being willing
to oblige and tolerate all denominations of Christians alike.   Ad-
mitting, however, this to have been the fact, it cannot alter the con-
struction of their deed in this case.   The rule of construction and
the effect of the deed must be the same as if it were shown that they
were unwilling to favour any other denomination than that of the
Presbyterians.   But it is also said that the terms of the trust in
the deed prescribe no form of doctrine or discipline.   This appears
to me to be a mistake; for if not clearly expressed, it is at least
necessarily implied by the description given therein of the bene-
ficiary, and the purpose for which the lot of ground is expressly
granted.   The beneficiary is described as a Presbyterian society
or congregation.   Now, it has been shown already that this
society could not have been such as described in the deed with-
out a profession, by them, of their faith in the Presbyterian doc-
trines, and a submission on their part to the government of that
church, by an observance of their directory for worship, &c.
That such had been their profession and submission was fully
proved by their practice and usage for a course of twenty years
and more before the date of the deed.   The purpose also for
which the lot was expressly granted, shows most clearly that
it was to accommodate the *cestuis que trust* in their worship of
God as Presbyterians.   It is given to them " for and as a site for

a house of *religious worship*, &c., of the said *religious society of English Presbyterians.*" Thus showing, as it were, to demonstration, that the lot of ground was granted with a view to promote and maintain the religious worship of God according to the faith, directory, and form of government adopted by the Presbyterian Church. In this view the donees and beneficiaries had a right to consider it; and without the consent, therefore, of each and every one of them, the subject of the grant cannot be diverted from its original purpose. Hence it is a great misconception of the terms and effect of the grant, in this case, to suppose that it was left to any portion of the beneficiaries to apply the gift to such pious uses as they should think fit; and certainly an equally great error to suppose, because subjection, on the part of the beneficiaries, to the government of the Presbyterian Church, as it then existed, is not formally and expressly mentioned as a condition upon which the gift is made, that, therefore, the lot was given subject to the direction of a majority of the congregation as long as they claimed to retain the name of Presbyterians, although they had renounced all subjection to the government of that church with which they were connected at the time of the grant. This would be contrary to all that Lord Eldon has laid down on the subject; the substance of which is this: " that if it appear from the face of the deed declaring the trust, what form or species of religious worship was intended; or where this is not the case, and it can be ascertained from the usage of the congregation in respect to it, it is the duty of the court to administer the trust, in the first case, so as to promote and maintain the form of religious worship mentioned; and in the latter case, so as to establish the usage which had obtained in regard to it; because, in the first case, it is matter of express contract that it should be so, and in the second case, it is matter of implied contract between the members of the congregation, and therefore, in neither case can the court permit or sanction any alteration in the original purpose of its application." The effect, therefore, is the same as if the form of worship mentioned in the deed, or shown by proof of usage, had been made a formal condition of bestowing the gift. Suppose the defendants in this case, after withdrawing from the Presbyterian Church as they did, had joined the church of the Cumberland Presbyterians; it certainly could not be said with propriety, or any show of reason, that they were in a religious point of view the same society or congregation that is described in the deed and shown by their religious practice and usage to have existed as a Presbyterian congregation in connexion with and under the care and protection of the government of the Presbyterian Church in the United States for upwards of twenty years before the execution of the deed. If it could, under such a change, be considered the same congregation, where, I would ask, is the difference between that case and the present, of their having joined the New School Pres-

I. — E *

byterians? I confess I can perceive none. It may possibly, however, be answered, that there is a difference of opinion in regard to doctrine, on some religious points, between the Old School Presbyterians and the Cumberland Presbyterians. This, I believe, is true; and I have no doubt that there is also a difference of opinion existing between the Old School Presbyterians and the New School Presbyterians, on certain religious points; and for this reason, as well as that of their being now under separate church governments, they are not the same religious body of Christians. Indeed, it is impossible to avoid believing that such a difference of opinion does exist between them; because it is wholly incredible that the separation which has taken place between them, should have happened without such a difference of opinion. It is the only cause that could have interrupted the peace and harmony that once existed among them, and finally have produced the separation. The great number of men on both sides, distinguished for their eminent abilities, learning and piety, was sufficient to, and doubtless would have preserved the peace and unity of the church from being disturbed or broken up by any other cause. It may be said, however, and no doubt with truth also, that both parties still, by profession, make the Confession of Faith the standard of their rule of faith and practice. But, notwithstanding they may each be perfectly honest in such profession, yet it occurs too frequently that men, equally intelligent and upright, differ in their exposition of the same text or the same rule; and perhaps more frequently in the application of the same rules to the same state of facts, and thus come to directly opposite conclusions in regard to the case. This arises from human fallibility; for it must be admitted that man is prone to err, and often refuses his assent to the truth, even when fairly presented to him: and hence have arisen the various denominations of professing Christians. This difference of opinion which takes place so frequently among us, is not confined to religious matters; for the case before us, and I regret it extremely, furnishes an example of the truth of this proposition, in which the judges of this court, professing to be governed by the same legal rules and principles, have in the application of them come to opposite conclusions.

It may not perhaps, however, be so easy to discover which of us here have departed from the proper application of these rules, to which we all profess to adhere, as it would be to determine whether it was the old school or the new school that departed from the long established and generally received opinion and exposition of the matters contained in the Presbyterian Confession of Faith. The new school are charged with it; and the appellation given to them would seem to be *prima facie* evidence of the fact; while the separation that has taken place, is strong evidence that a real difference of opinion exists between the two parties,

in regard to matters of religious faith and practice. It is evident, therefore, that they are no longer the same body, but separate, distinct, and independent, living under different governments. Hence, both cannot be the primitive Presbyterian church of the United States. The new body could only be so by taking the place of the old. But this could not be, unless the old be dissolved or defunct; which is not the case, as was adjudged by this court in the case of *The Commonwealth* v. *Green and others*, referred to before. The old school are therefore the original Presbyterian Church of the United States. Now all that is here said of the old and new school parties, may be predicated of the plaintiffs and defendants. Both can not be the old congregation, for whose benefit and accommodation the lot of ground in question was granted. The old congregation formed a part of the old original Presbyterian church. The plaintiffs, who were all of that congregation, still adhere to that church, and form a constituent part of it; whereas, the defendants, on the contrary, have withdrawn themselves from it, and joined the new school church, which, as has been just shown, is an entirely different body. But the identity of a particular church or congregation depends, as we have seen, as much at least upon its adherence to the government of the church to which it was originally annexed, as upon its adherence to the same religious doctrines and form of worship. It therefore being clear that the old congregation cannot be considered dissolved or dead as long as any portion of them remain in being, it would be not only anomalous, but unjust, to permit the defendants to hold the property in question against the claim of the plaintiffs, and those whom they represent, as they are the old and original congregation, for whose use and accommodation it was granted. To decide in favour of the defendants, under such circumstances, would be permitting them to say to the plaintiffs, " We have changed our opinions in respect to the doctrines and worship prescribed by the church, with which we were all united at the time the property was granted, for the purpose of enabling us the more conveniently to attend upon and have the benefit of such doctrines preached, and worship celebrated among us; and you, although you claim it for this purpose, cannot have or enjoy the benefit of it again, unless you alter your opinions in conformity to ours, and unite yourselves with the new and independent church which we have joined." But this is what Lord Eldon declares the defendants have no right to say. For, says he, " when a congregation becomes dissatisfied among themselves, the *nature of the original institution* must alone be looked to as the *guide* for the decision of the court; and that to refer to any other criterion, such as the *sense of the existing majority*, would be to make a new institution, which is altogether beyond the reach, and inconsistent with the duties and character of the court."

Having shown now, as I conceive, in answer to the first question, that the plaintiffs and those whom they represent are, in contemplation of law, to be deemed the society or congregation for whose benefit the lot in question was granted by the Penns, it follows of course, according to the admission of the parties, that the plaintiffs must be regarded as the corporation created by the charter of 1813.

Having thus disposed of the first question, I come now to the second, which is, Have the plaintiffs, admitting them to be the corporation created by the charter of 1813, a right in this action, as such, to recover the possession of the property in question? The learned judge of the court below gave a negative answer to this question in his charge to the jury. In this, however, we all agree that he erred. It is true, as the judge said, that the legal title in fee to the property in dispute, became vested by the deed from the Penns in the trustees therein named, and that it still remains in them, the survivors or survivor; or, if all be dead, as would seem to be probable, in the heirs of the last survivor. The congregation's becoming incorporated did not affect the legal title, or transfer it to the corporation, though the great object of becoming incorporated was, no doubt, to enable them- to have their temporal rights, connected with the church, taken care of, and to procure every thing of the kind that might be wanting in this respect. But it is certainly not correct, as the court below seemed to think it was, that the corporation could not recover the possession of the property in this action, unless they were invested with the legal title. A right to the possession is sufficient to enable a plaintiff in ejectment to recover, although it be only equitable. In this state, having had no court of equity to apply to on the subject, the *cestui que trust,* if he be entitled to the possession, for the purpose of enabling him to enjoy the trust in the manner that was intended, may maintain ejectment for it in his own name, either against the trustee himself or any other person. It is only where it is proper, that the trustee should have the possession for the purpose of enabling him to execute the trust, in the manner prescribed by the deed declaring it, that he can resist the claim of the *cestui que trust* to it. *Kennedy* v. *Fury,* 1 *Dallas* 72; *Crunkelton* v. *Evert,* 3 *Yeates* 570; *Cecil* v. *Korbman,* 1 *Binn.* 134, 137; *Hunt* v. *Crawford,* 3 *Penn. Rep.* 426. By the 3d article of the charter of incorporation, it is made the duty of the trustees of the congregation, the plaintiffs, to apply the rents, profits, and interest of the real and personal estate of the congregation to the maintenance and support of the gospel ministry in the same, and also to repair and maintain the *house of public worship, burial-ground,* &c. (the identical property in dispute) as shall be thought just and right by them. They are further authorized by the 6th article, "to do every thing needful for the management of the secular affairs of the said congregation." Thus, having the care

and management of the property in question given to them, they must, therefore, be considered as *virtute officii* entitled to the possession, as it was held in *The People* v. *Runkle,* 9 *Johns. Rep.* 156; and consequently may well maintain this action.

HUSTON, J., also dissented from the opinion of the Court.

Judgment affirmed.